KALINA *v.* FLETCHER

No. 96–792.   Argued October 7, 1997—Decided December 10, 1997

STEVENS, J., delivered the opinion for a unanimous Court. SCALIA, J., filed a concurring opinion, in which THOMAS, J., joined, *post*, p. 131.

*Norm Maleng* argued the cause for petitioner. With him on the briefs were *Michael C. Duggan* and *John W. Cobb.*

*Patricia A. Millett* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Acting Solicitor General Dellinger, Assistant Attorney General Hunger, Deputy Solicitor General Waxman, Deputy Assistant Attorney General Preston, Barbara L. Herwig,* and *Peter R. Maier.*

*Timothy K. Ford* argued the cause for respondent. With him on the brief were *Robert S. Mahler* and *Daniel Hoyt Smith.**

JUSTICE STEVENS delivered the opinion of the Court.

The question presented is whether 42 U. S. C. § 1983 creates a damages remedy against a prosecutor for making false statements of fact in an affidavit supporting an application for an arrest warrant, or whether, as she contends, such conduct is protected by "the doctrine of absolute prosecutorial immunity."

I

Petitioner is a deputy prosecuting attorney for King County, Washington. Following customary practice, on December 14, 1992, she commenced a criminal proceeding

---

*Briefs of *amici curiae* urging reversal were filed for the State of Maryland et al. by *J. Joseph Curran, Jr.*, Attorney General of Maryland, and *Andrew H. Baida* and *John B. Howard, Jr.*, Assistant Attorneys General, and by the Attorneys General for their respective jurisdictions as follows: *William H. Pryor, Jr.*, of Alabama; *Bruce M. Botelho* of Alaska, *Grant Woods* of Arizona, *Daniel E. Lungren* of California, *Robert A. Butterworth* of Florida, *Calvin E. Holloway, Sr.*, of Guam, *Margery S. Bronster* of Hawaii, *James E. Ryan* of Illinois, *Thomas J. Miller* of Iowa, *Carla J. Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *Scott Harshbarger* of Massachusetts, *Frank J. Kelley* of Michigan, *Mike Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Frankie Sue Del Papa* of Nevada, *Steven M. Houran* of New Hampshire, *Dennis C. Vacco* of New York, *Heidi Heitkamp* of North Dakota, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *Mark Barnett* of South Dakota, *J. Wallace Malley, Jr.*, of Vermont, *Julio A. Brady* of the Virgin Islands, *Christine O. Gregoire* of Washington, *Darrell V. McGraw, Jr.*, of West Virginia, *James E. Doyle* of Wisconsin, and *William U. Hill* of Wyoming; for the Thirty-Nine Counties of the State of Washington by *Russell D. Hauge, Pamela Beth Loginsky, David Bruneau, Arthur Curtis, Allen C. Nielson, David Skeen, Norm Maleng, Jeremy Randolf, John Ladenburg, James Sweetser, James L. Nagle, David S. McEachran, James Kaufman,* and *Jeffrey C. Sullivan;* for the National Association of Counties et al. by *Richard Ruda* and *James I. Crowley;* and for the National District Attorneys' Association et al. by *Gil Garcetti* and *Roderick W. Leonard.*

against respondent by filing three documents in the King County Superior Court. Two of those documents—an information charging respondent with burglary and a motion for an arrest warrant—were unsworn pleadings. The burglary charge was based on an alleged theft of computer equipment from a school.

Washington Criminal Rules require that an arrest warrant be supported by an affidavit or "sworn testimony establishing the grounds for issuing the warrant."[1] To satisfy that requirement, petitioner supported her motion with a third document—a "Certification for Determination of Probable Cause"—that summarized the evidence supporting the charge. She personally vouched for the truth of the facts set forth in the certification under penalty of perjury.[2] Based on petitioner's certification, the trial court found probable cause and ordered that an arrest warrant be issued.

Petitioner's certification contained two inaccurate factual statements. After noting that respondent's fingerprints had been found on a glass partition in the school, petitioner stated that respondent had "never been associated with the school in any manner and did not have permission to enter the school or to take any property."[3] In fact, he had installed partitions on the premises and was authorized to enter the school. She also stated that an employee of an electronics store had identified respondent "from a photo montage" as the person who had asked for an appraisal of a computer stolen from the school.[4] In fact, the employee did not identify respondent.[5]

---

[1] Washington Criminal Rule 2.2(a); see Wash. Rev. Code §9A.72.085 (1994) (providing, *inter alia*, that a certification made under penalty of perjury is the equivalent of an affidavit). Accord, King County Local Criminal Rule 2.2.

[2] App. 20.

[3] *Id.*, at 19–20.

[4] *Id.*, at 20.

[5] *Id.*, at 5.

Respondent was arrested and spent a day in jail. About a month later, the charges against him were dismissed on the prosecutor's motion.

## II

Respondent brought this action under Rev. Stat. § 1979, as amended, 42 U. S. C. § 1983, seeking damages from petitioner based on her alleged violation of his constitutional right to be free from unreasonable seizures. In determining immunity, we accept the allegations of respondent's complaint as true. See *Buckley* v. *Fitzsimmons,* 509 U. S. 259, 261 (1993). Respondent's complaint focuses on the false statements made by petitioner in the certification.[6] Petitioner moved for summary judgment on the ground that the three documents that she filed to commence the criminal proceedings and to procure the arrest warrant were protected by "the doctrine of absolute prosecutorial immunity."[7] The District Court denied the motion, holding that she was not entitled to absolute immunity and that whether qualified immunity would apply was a question of fact.[8] The Court of Appeals for the Ninth Circuit affirmed.

The Ninth Circuit first noted that under our decision in *Malley* v. *Briggs,* 475 U. S. 335 (1986), "a *police officer* who secures an arrest warrant without probable cause cannot assert an absolute immunity defense," and then observed that petitioner's "actions in writing, signing and filing the declaration for an arrest warrant" were "virtually identical to the police officer's actions in *Malley.*" 93 F. 3d 653, 655–656 (1996). Relying on the functional approach endorsed in *Buckley* v. *Fitzsimmons,* the Court of Appeals concluded that "it would be 'incongruous' to expose police to potential liability while protecting prosecutors for the same act." 93 F. 3d, at 656.

---

[6] *Id.,* at 5–6.
[7] *Id.,* at 10.
[8] *Id.,* at 21.

The Court of Appeals acknowledged that the Sixth Circuit had reached a different result in *Joseph* v. *Patterson*, 795 F. 2d 549, 555 (1986), cert. denied, 481 U. S. 1023 (1987), a case that predated our decision in *Buckley*. Because we have never squarely addressed the question whether a prosecutor may be held liable for conduct in obtaining an arrest warrant, we granted certiorari to resolve the conflict. 519 U. S. 1148 (1997). We now affirm.

## III

Section 1983 is a codification of § 1 of the Civil Rights Act of 1871.[9] The text of the statute purports to create a damages remedy against every state official for the violation of any person's federal constitutional or statutory rights.[10] The coverage of the statute is thus broader than the preexisting common law of torts. We have nevertheless recognized that Congress intended the statute to be construed in the light of common-law principles that were well settled at the time of its enactment. See *Tenney* v. *Brandhove*, 341 U. S. 367 (1951); *Briscoe* v. *LaHue*, 460 U. S. 325, 330 (1983). Thus, we have examined common-law doctrine when identifying both the elements of the cause of action and the defenses available to state actors.

In *Imbler* v. *Pachtman*, 424 U. S. 409 (1976), we held that a former prisoner whose conviction had been set aside in collateral proceedings could not maintain a § 1983 action against the prosecutor who had litigated the charges against him. Relying in part on common-law precedent, and per-

---

[9] See *Briscoe* v. *LaHue*, 460 U. S. 325, 337 (1983).

[10] Title 42 U. S. C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

haps even more importantly on the policy considerations underlying that precedent, we concluded that "a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution" was not amenable to suit under § 1983. *Id.*, at 410.

Liberally construed, Imbler's complaint included not only a charge that the prosecution had been wrongfully commenced, but also a charge that false testimony had been offered as well as a charge that exculpatory evidence had been suppressed. His constitutional claims were thus broader than any specific common-law antecedent. Nevertheless, relying on common-law decisions providing prosecutors with absolute immunity from tort actions based on claims that the decision to prosecute was malicious and unsupported by probable cause,[11] as well as from actions for defamation based on statements made during trial,[12] we concluded that

---

[11] See 424 U. S., at 421–422. The cases that the Court cited were decided after 1871 and granted a broader immunity to public prosecutors than had been available in malicious prosecution actions against private persons who brought prosecutions at early common law. See *Savile* v. *Roberts*, 1 Ld. Raym. 374, 91 Eng. Rep. 1147 (K. B. 1699); *Hill* v. *Miles*, 9 N. H. 9 (1837); M. Bigelow, Leading Cases on the Law of Torts 193–204 (1875). However, these early cases were decided before the office of public prosecutor in its modern form was common. See Langbein, The Origins of Public Prosecution at Common Law, 17 Am. J. Legal Hist. 313, 316 (1973); Kress, Progress and Prosecution, 423 Annals Am. Acad. Pol. & Soc. Sci. 99, 100–102 (1976); *White* v. *Frank*, 855 F. 2d 956, 962 (CA2 1988) (noting that "the availability of the malicious prosecution action has been curtailed with the growth of the office of the public prosecutor"). Thus, the Court in *Imbler* drew guidance both from the first American cases addressing the availability of malicious prosecution actions against public prosecutors, and perhaps more importantly, from the policy considerations underlying the firmly established common-law rules providing absolute immunity for judges and jurors. See 424 U. S., at 423, n. 20 (discussing similarity in some functions performed by judges, jurors, and prosecutors); *Bradley* v. *Fisher*, 13 Wall. 335, 347 (1872); *Yates* v. *Lansing*, 5 Johns. 282 (N. Y. 1810) (Kent, C. J.); Note, Civil Liability of a District Attorney for Quasi-Judicial Acts, 73 U. Pa. L. Rev. 300, 303, n. 13 (1925).

[12] See 424 U. S., at 439–440 (White, J., concurring in judgment).

the statute should be construed to provide an analogous defense against the claims asserted by Imbler. The policy considerations that justified the common-law decisions affording absolute immunity to prosecutors when performing traditional functions applied equally to statutory claims based on the conduct of the same functions.

Those considerations included both the interest in protecting the prosecutor from harassing litigation that would divert his time and attention from his official duties and the interest in enabling him to exercise independent judgment when "deciding which suits to bring and in conducting them in court." *Id.*, at 424. The former interest would lend support to an immunity from all litigation against the occupant of the office whereas the latter is applicable only when the official is performing functions that require the exercise of prosecutorial discretion. Our later cases have made it clear that it is the interest in protecting the proper functioning of the office, rather than the interest in protecting its occupant, that is of primary importance.

In *Imbler*, we did not attempt to define the outer limits of the prosecutor's absolute immunity, but we did recognize that our rationale would not encompass some of his official activities. Thus, while we concluded that Pachtman's "activities were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force," *id.*, at 430, we put to one side "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate," *id.*, at 430–431.

Subsequent cases have confirmed the importance to the judicial process of protecting the prosecutor when serving as an advocate in judicial proceedings. Thus, in *Burns* v. *Reed*, 500 U. S. 478 (1991), after noting the consensus among the Courts of Appeals concerning prosecutorial conduct before grand juries, *id.*, at 490, n. 6, we held that the prosecutor's

appearance in court in support of an application for a search warrant and the presentation of evidence at that hearing were protected by absolute immunity, *id.*, at 492. And in *Buckley,* we categorically stated that "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity." 509 U. S., at 273.

In both of those cases, however, we found the defense unavailable when the prosecutor was performing a different function. In *Burns,* the provision of legal advice to the police during their pretrial investigation of the facts was protected only by qualified, rather than absolute, immunity. 500 U. S., at 492–496. Similarly, in *Buckley,* the prosecutor was not acting as an advocate either when he held a press conference, 509 U. S., at 276–278, or when he allegedly fabricated evidence concerning an unsolved crime. With reference to the latter holding, we explained:

> "There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.' *Hampton* v. *Chicago,* 484 F. 2d 602, 608 (CA7 1973) (internal quotation marks omitted), cert. denied, 415 U. S. 917 (1974). Thus, if a prosecutor plans and executes a raid on a suspected weapons cache, he 'has no greater claim to complete immunity than activities of police officers allegedly acting under his direction.' 484 F. 2d, at 608–609." *Id.,* at 273–274.

These cases make it clear that the absolute immunity that protects the prosecutor's role as an advocate is not grounded in any special "esteem for those who perform these functions, and certainly not from a desire to shield abuses of office, but because any lesser degree of immunity could impair the judicial process itself." *Malley*, 475 U. S., at 342. Thus, in determining immunity, we examine "the nature of the function performed, not the identity of the actor who performed it." *Forrester* v. *White*, 484 U. S. 219, 229 (1988).[13] This point is perhaps best illustrated by the determination that the senior law enforcement official in the Nation—the Attorney General of the United States—is protected only by qualified, rather ·than absolute, immunity when engaged in the performance of national defense functions rather than prosecutorial functions. *Mitchell* v. *Forsyth*, 472 U. S. 511 (1985).

In *Malley* we considered, and rejected, two theories on which immunity might have been accorded to a police officer who had caused an unconstitutional arrest by presenting a judge with a complaint and supporting affidavit that failed to establish probable cause. His first argument, that his function was comparable to that of a complaining witness, actually militated against his claim because such witnesses were subject to suit at common law.[14]

---

[13] Examining the nature of the function performed is·not a recent innovation. In *Ex parte Virginia*, 100 U. S. 339, 348 (1880), we stated "[w]hether the act done by [a judge] was judicial or not is to be determined by its character, and not by the character of the agent." See also *Bradley* v. *Fisher*, 13 Wall., at 347 (examining "the character of the act" performed by a judge).

[14] We noted that:

"[C]omplaining witnesses were not absolutely immune at common law. In 1871, the generally accepted rule was that one who procured the issuance of an arrest warrant by submitting a complaint could be held liable if the complaint was made maliciously and without probable cause. Given malice and the lack of probable cause, the complainant enjoyed no immu-

His second argument rested on the similarity between his conduct and the functions often performed by prosecutors. As we explained:

> "As an alternative ground for claiming absolute immunity, petitioner draws an analogy between an officer requesting a warrant and a prosecutor who asks a grand jury to indict a suspect. Like the prosecutor, petitioner argues, the officer must exercise a discretionary judgment based on the evidence before him, and like the prosecutor, the officer may not exercise his best judgment if the threat of retaliatory lawsuits hangs over him. Thus, petitioner urges us to read § 1983 as giving the officer the same absolute immunity enjoyed by the prosecutor. Cf. *Imbler* v. *Pachtman*, 424 U. S. 409 (1976).

> .        .        .        .

> ". . . We intend no disrespect to the officer applying for a warrant by observing that his action, while a vital part of the administration of criminal justice, is further removed from the judicial phase of criminal proceedings than the act of a prosecutor in seeking an indictment. Furthermore, petitioner's analogy, while it has some force, does not take account of the fact that the prosecutor's act in seeking an indictment is but the first step in the process of seeking a conviction. Exposing the prosecutor to liability for the initial phase of his prosecutorial work could interfere with his exercise of independent judgment at every phase of his work, since the prosecutor might come to see later decisions in terms of their effect on his potential liability. Thus, we shield the prosecutor seeking an indictment because any lesser immunity could impair the performance of a central actor in the judicial process." 475 U. S., at 341–343.

---

nity. The common law thus affords no support for petitioner." *Malley* v. *Briggs*, 475 U. S. 335, 340–341 (1986) (footnote omitted).

These cases make it quite clear that petitioner's activities in connection with the preparation and filing of two of the three charging documents—the information and the motion for an arrest warrant—are protected by absolute immunity. Indeed, except for her act in personally attesting to the truth of the averments in the certification, it seems equally clear that the preparation and filing of the third document in the package was part of the advocate's function as well. The critical question, however, is whether she was acting as a complaining witness rather than a lawyer when she executed the certification "[u]nder penalty of perjury." We now turn to that question.

## IV

The Fourth Amendment requires that arrest warrants be based "upon probable cause, supported by Oath or affirmation"—a requirement that may be satisfied by an indictment returned by a grand jury, but not by the mere filing of criminal charges in an unsworn information signed by the prosecutor. *Gerstein* v. *Pugh*, 420 U. S. 103, 117 (1975); see also *Coolidge* v. *New Hampshire*, 403 U. S. 443 (1971). Accordingly, since most prosecutions in Washington are commenced by information, Washington law requires, in compliance with the constitutional command, that an arrest warrant be supported by either an affidavit "or sworn testimony establishing the grounds for issuing the warrant."[15] The "Certification for Determination of Probable Cause" executed by petitioner was designed to satisfy those requirements.

Although the law required that document to be sworn or certified under penalty of perjury, neither federal nor state law made it necessary for the prosecutor to make that certification. In doing so, petitioner performed an act that any

---

[15] Washington Criminal Rule 2.2(a) (1995) provides:

"A warrant of arrest must be supported by an affidavit, . . . or sworn testimony establishing the grounds for issuing the warrant. . . . The court must determine there is probable cause . . . before issuing the warrant. "

competent witness might have performed. Even if she may have been following a practice that was routinely employed by her colleagues and predecessors in King County, Washington, that practice is surely not prevalent in other parts of the country and is not even mandated by law in King County. Neither petitioner nor *amici* argue that prosecutors routinely follow the King County practice.[16] Indeed, tradition, as well as the ethics of our profession, generally instruct counsel to avoid the risks associated with participating as both advocate and witness in the same proceeding.[17]

Nevertheless, petitioner argues that the execution of the certificate was just one incident in a presentation that, viewed as a whole, was the work of an advocate and was integral to the initiation of the prosecution. That characterization is appropriate for her drafting of the certification, her determination that the evidence was sufficiently strong to justify a probable-cause finding, her decision to file charges, and her presentation of the information and the motion to the court. Each of those matters involved the exercise of professional judgment; indeed, even the selection of the particular facts to include in the certification to provide the evidentiary support for the finding of probable cause required the exercise of the judgment of the advocate. But that judgment could not affect the truth or falsity of the factual statements themselves. Testifying about facts is the function of the witness, not of the lawyer. No matter how

---

[16] *Amicus Curiae* United States points out that federal prosecutors typically do not personally attest to the facts in an affidavit filed in support of an application for an arrest warrant, but "[i]nstead a law enforcement agent ordinarily attests to those facts." Brief 7. *Amici Curiae* Thirty-Nine Counties of the State of Washington state that local court rules in only two counties in Washington require the prosecutor to file an additional document beyond an information. Brief 2.

[17] See, *e. g.*, Washington Rule of Professional Conduct 3.7 (1995) ("A lawyer shall not act as advocate at a trial in which the lawyer . . . is likely to be a necessary witness," unless four narrow exceptions apply); ABA Model Rules of Professional Conduct 3.7 (1992).

brief or succinct it may be, the evidentiary component of an application for an arrest warrant is a distinct and essential predicate for a finding of probable cause. Even when the person who makes the constitutionally required "Oath or affirmation" is a lawyer, the only function that she performs in giving sworn testimony is that of a witness.

Finally, petitioner argues that denying her absolute immunity will have a "chilling effect" on prosecutors in the administration of justice.[18] We are not persuaded.

It may well be true that prosecutors in King County may abandon the practice of routinely attesting to the facts recited in a "Certification for Determination of Probable Cause" and pattern their procedures after those employed in other parts of the Nation. Petitioner presents no evidence that the administration of justice is harmed where the King County practice is not followed. In other respects, however, her argument addresses concerns that are not affected by our decision because we merely hold that § 1983 may provide a remedy for respondent insofar as petitioner performed the function of a complaining witness. We do not depart from our prior cases that have recognized that the prosecutor is fully protected by absolute immunity when performing the traditional functions of an advocate. See *Imbler*, 424 U. S., at 431; *Buckley*, 509 U. S., at 273.

Accordingly, the judgment of the Court of Appeals for the Ninth Circuit is

*Affirmed.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring.

I agree that Ms. Kalina performed essentially the same "function" in the criminal process as the police officers in *Malley* v. *Briggs*, 475 U. S. 335 (1986), and so I join the opinion of the Court. I write separately because it would be a

---

[18] Brief for Petitioner 25.

shame if our opinions did not reflect the awareness that our "functional" approach to 42 U. S. C. § 1983 immunity questions has produced some curious inversions of the common law as it existed in 1871, when § 1983 was enacted. A conscientious prosecutor reading our cases should now conclude that there is absolute immunity for the decision to seek an arrest warrant after filing an information, but only qualified immunity for testimony as a witness in support of that warrant. The common-law rule was, in a sense, exactly opposite.

There was, of course, no such thing as absolute prosecutorial immunity when § 1983 was enacted. (Indeed, as the Court points out, *ante*, at 124, n. 11, there generally was no such thing as the modern public prosecutor.) The common law recognized a "judicial" immunity, which protected judges, jurors and grand jurors, members of courts-martial, private arbitrators, and various assessors and commissioners. That immunity was absolute, but it extended only to individuals who were charged with resolving disputes between other parties or authoritatively adjudicating private rights. When public officials made discretionary policy decisions that did not involve actual adjudication, they were protected by "quasi-judicial" immunity, which could be defeated by a showing of malice, and hence was more akin to what we now call "qualified," rather than absolute, immunity. I continue to believe that "prosecutorial functions, had they existed in their modern form in 1871, would have been considered quasi-judicial." *Burns* v. *Reed*, 500 U. S. 478, 500 (1991) (SCALIA, J., concurring in judgment in part and dissenting in part).

That conclusion accords with the common law's treatment of *private* prosecutors, who once commonly performed the "function" now delegated to public officials like petitioner. A private citizen who initiated or procured a criminal prosecution could (and can still) be sued for the tort of malicious prosecution—but only if he acted maliciously and without

probable cause, and the prosecution ultimately terminated in the defendant's favor. Thus, although these private prosecutors (sometimes called "complaining witnesses"), since they were not public servants, were not entitled to quasi-judicial immunity, there was a kind of qualified immunity built into the elements of the tort.

The common law also recognized an absolute immunity for statements made in the course of a judicial proceeding and relevant to the matter being tried. That immunity protected both witnesses and attorneys, and could not be defeated even by an allegation that the statement was maliciously false. See, e. g., F. Hilliard, Law of Torts 319 (1866). It was, however, an immunity only against slander and libel actions.

At common law, therefore, Kalina would have been protected by something resembling qualified immunity if she were sued for malicious prosecution. The tortious act in such a case would have been her decision to bring criminal charges against Fletcher, and liability would attach only if Fletcher could prove that the prosecution was malicious, without probable cause, and ultimately unsuccessful. Kalina's false statements as a witness in support of the warrant application would not have been an independent actionable tort (although they might have been *evidence* of malice or initiation in the malicious prosecution suit), because of the absolute privilege protecting such testimony from suits for defamation.

The Court's long road to what is, superficially at least, the opposite result in today's opinion, began with *Imbler* v. *Pachtman*, 424 U. S. 409 (1976), which granted prosecutors absolute immunity for the "function" of initiating a criminal prosecution. Then, in *Briscoe* v. *LaHue*, 460 U. S. 325 (1983), the Court extended a similar absolute immunity to the "function" of serving as a witness. And in *Malley* v. *Briggs, supra*, it recognized the additional "functional category" of "complaining witness." Since this category was

134

entitled to only qualified immunity, the Court overturned a directed verdict in favor of a police officer who had caused the plaintiff to be arrested by presenting a judge with a complaint and an affidavit supporting probable cause. The Court said:

> "[C]omplaining witnesses were not absolutely immune at common law. In 1871, the generally accepted rule was that one who procured the issuance of an arrest warrant by submitting a complaint could be held liable if the complaint was made maliciously and without probable cause. Given malice and the lack of probable cause, the complainant enjoyed no immunity." *Id.*, at 340–341.

That statement is correct, but it implies a distinction between "witnesses" (absolutely immune) and "complaining witnesses" (at best qualifiedly immune) which has little foundation in the common law of 1871. That law did not recognize two kinds of witness; it recognized two different torts. "In this sense, then, *Malley*'s discussion of complaining witnesses is a feint. The Court was not awaking to a different type of witness . . . so much as recognizing a different cause of action—the action for malicious prosecution." Comment, Police Witness Immunity Under § 1983, 56 U. Chi. L. Rev. 1433, 1454 (1989). By the time *Malley* was decided, however, the Court's methodology forced it to express its conclusion in terms of whether the particular "function" at issue would have been entitled to immunity at common law. See, *e. g., Briscoe, supra*, at 342 ("[O]ur cases clearly indicate that immunity analysis rests on functional categories"). By inventing "a new functional category: the complaining witness, who (in the Court's specially-tailored history) was liable at common law and so is liable under § 1983," Comment, *supra*, at 1454, *Malley* moved the Court's immunity jurisprudence much closer to the results the common law would have achieved.

But no analytical approach based upon "functional analysis" can faithfully replicate the common law, as is demonstrated in the Court's opinion today. By describing the subset of actors in the criminal process who are subject to suit as "complaining *witnesses*," the Court implies that testifying is the critical event. But a "complaining witness" could be sued for malicious prosecution whether or not he ever provided factual testimony, so long as he had a role in initiating or procuring the prosecution; in that sense, the "witness" in "complaining witness" is misleading. As applied to the police officers in *Malley*, that confusion was more or less harmless. Here, however, *Imbler* and *Malley* collide to produce a rule that stands the common law on its head: Kalina is absolutely immune from any suit challenging her decision to prosecute or seek an arrest warrant, but can be sued if she changes "functional categories" by providing personal testimony to the Court.

*Imbler*'s principle of absolute prosecutorial immunity, and the "functional categories" approach to immunity questions imposed by cases like *Briscoe*, make faithful adherence to the common law embodied in § 1983 very difficult. But both *Imbler* and the "functional" approach are so deeply embedded in our § 1983 jurisprudence that, for reasons of *stare decisis*, I would not abandon them now. Given those concessions, *Malley*'s distortion of the term "complaining witness" may take us as close to the right answer as we are likely to get. Because Kalina's conduct clearly places her in that functional category, I agree with the Court that she is not entitled to absolute immunity under our precedents.