

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-7-2002

# Donahue v. Gavin

Precedential or Non-Precedential:

Docket 0-2082

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Donahue v. Gavin" (2002). *2002 Decisions.* Paper 110.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/110

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 7, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2082

CHRISTOPHER F. DONAHUE,

      Appellant

v.

JAMES GAVIN; GEORGE YATRON; MICHAEL MARINO;
JEFFREY HAWBECKER; PAUL EVANKO; RICHARD
PATTON; JAMES GIRARD; GREGORY PEASE; JOHN
SHANAHAN; ROBERT SCHWARZ; BERKS COUNTY; FIRST
SAVINGS BANK OF PERKASIE; BELL ATLANTIC, INC.

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Civ. No. 98-cv-01602)
District Judge: Hon. Thomas N. O'Neill, Jr.

Argued: January 8, 2001

Before: MANSMANN, McKEE and AMBRO, Circuit Jud ges

(Opinion filed: February 7, 2002)

        JORDAN B. YEAGER, ESQ. (Argued)
        Boockvar & Yeager
        714 Main Street
        Bethlehem, PA 18018
        Attorney for Appellant

D. MICHAEL FISHER, ESQ.
Attorney General of the
 Commonwealth of Pennsylvania
JOHN O. J. SHELLENBERGER,
 ESQ. (Argued)
Chief Deputy Attorney General
CALVIN R. KOONS, ESQ.
Senior Deputy Attorney General
JOHN G. KNORR, III, ESQ.
Chief Deputy Attorney General
Chief, Appellate Division
Office of the Attorney General
21 S. 12th Street, 3rd Floor
Philadelphia, PA 19107
Attorneys for Appellees,
James Girard and Gregory Pease

BARRY W. SAWTELLE, ESQ.
  (Argued)
Kozloff Stoudt, P. C.
The Berkshire, 6th Floor
501 Washington Street
P. O. Box 877
Reading, PA 19603
Attorneys for Appellees,
James Gavin, George Yatron and
Berks County

OPINION OF THE COURT

McKEE, Circuit Judge.

Christopher F. Donahue appeals the district court's grant of summary judgment in favor of the defendants and against Donahue in his civil rights action under 42 U.S.C. S 1983. The district court based its ruling on its determination that each of the defendants had either qualified or absolute immunity. The suit arises from the investigation and prosecution of a marijuana distribution conspiracy involving Donahue. He alleges a civil rights claim based upon defendants' purported malicious

2

prosecution of him in violation of the Fourth Amendment.1
For the reasons that follow, we will affirm.2

I. FACTS

In late 1990, State Troopers Pease and Girard were the
lead officers in an investigation of a marijuana distribution
ring involving a Berks County resident named "Erwin
Bieber." In June of that year, Pease learned that a
marijuana dealer in Albuquerque, New Mexico was
regularly placing telephone calls from Albuquerque to
southeastern Pennsylvania. The telephone numbers he was
calling were listed to a telephone in Montgomery County
and one in Berks County. The Berks County number was
assigned to a business called "Guitars East." Erwin Bieber
received mail at the address listed for that business.

Pease responded by acquiring information that included
Bieber's telephone toll records. Meanwhile, the Albuquerque
Police Department placed a pen register on the New Mexico
dealer's telephone line.3 A pen register was also installed on
the Montgomery County telephone that the New Mexico
dealer was calling. Pease also learned that another
telephone was registered to Bieber at the address of
"Guitars East." The Montgomery County telephone involved
in calls to and from Albuquerque was also frequently being
used in making calls to and from Bieber's telephones.

_____

1. For the sake of simplicity, we will refer to Donahue's claim as arising
only under the Fourth Amendment even though the Fourth Amendment
applies to the defendants via the Fourteenth Amendment. See Karnes v.
Skrutski, 62 F.3d 485, 488 n.1 (3rd Cir. 1995).

2. Although we are affirming, we do so on grounds that are different from
the analysis of the district court. See Brumfield v. Sanders, 232 F.3d
376, 399 n.2 (3rd Cir. 2000) ("An appellate court may affirm a result
reached by the District Court on different reasons .. . as long as the
record supports the judgment.").

3. "A pen register is a `device which records or decodes electronic or
other impulses which identify the numbers dialed or otherwise
transmitted on the telephone line to which such device is attached.' "
United States v. Riddick 156 F.3d 505, 510 n.5 (3rd Cir. 1998)(citations
omitted).

In late 1990, the Berks County District Attorney's Office was asked to assist in the ongoing investigation the Pennsylvania State Police were conducting into this marijuana distribution ring, and Troopers Pease and Girard informed the Berks County District Attorney's Office of the information they had received from the Albuquerque Police Department. Yatron was then the Berks County District Attorney and James Gavin was an Assistant District Attorney. On October 2, 1990, the State Police installed pen registers on the two telephone lines registered to Bieber and Guitars East pursuant to authorizations obtained from the Berks County Court of Common Pleas.

Yatron and Gavin eventually filed two applications with the Pennsylvania Superior Court seeking authorization to conduct non-consensual electronic surveillance on Bieber's two telephone lines.4 The application included an affidavit signed by Troopers Pease and Girard. The Superior Court granted the application and entered orders authorizing interception of wire and oral communications on Bieber's two telephone lines.

Trooper Pacelli installed and activated monitoring equipment on Bieber's telephone lines pursuant to those authorizations.5 Thereafter, from October 12, to November 17, 1990, Pease, Girard, and other Troopers working with them listened to the telephone calls to and from Bieber's two telephones.6 The monitored conversations included discussions between Bieber and Donahue.

State Police had not been aware of Donahue before they began monitoring Bieber's telephone conversations.

_____

4. Unlike the pen registers that only recorded numbers dialed from Bieber's two phones, the October 12 request sought authorization to actually listen to (i.e., "seize") the contents of conversations on those phones.

5. Trooper Pacelli held a class "B" certification under the applicable Pennsylvania regulations, and that authorized him to perform such installations. He was trained and experienced in the installation and use of the monitoring equipment.

6. All of the troopers working with Pease and Girard had Class "A" certifications under the applicable Pennsylvania regulations for monitoring telephone calls.

4

However, once they began monitoring those calls, the State Police heard and recorded a number of conversations between Bieber and a "Christopher Donahue" residing at 1503 Callowhill Road in Perkasie, Pennsylvania.

We need not reiterate the rather involved chronology of the investigation that followed, the content of the many conversations that police recorded between Bieber and Donahue, or the results of the surveillance the police conducted while monitoring those calls. For our purposes, it is sufficient to note that the numerous discussions between Bieber and Donahue implicated both of them in a large conspiracy to distribute substantial quantities of marijuana in and around Berks County, Pennsylvania. Eventually, police learned that Bieber was receiving marijuana from sources in California and New Mexico and distributing it to several people in Pennsylvania, including Donahue.

On November 17, 1990, police followed Bieber to Philadelphia International Airport where he met two other men with suitcases. Police followed the trio from the airport to 1503 Callowhill Road, Donahue's residence. Police maintained surveillance as Bieber and his companions then drove to a trailer home owned by Steve Hartman. Police arrested the trio along with Hartman shortly after they left Hartman's trailer.

Bieber began to talk to the police almost immediately. He told Trooper Pease that he recently received 16 pounds of marijuana from suppliers in California and that he had delivered all 16 pounds to Donahue on November 7, 1990. Police arrested Donahue after additional investigation, and charged him with conspiracy to distribute marijuana, conspiracy to participate in a corrupt organization, and possession of marijuana with the intent to distribute. The arrest warrant for Donahue was based upon a criminal complaint that incorporated an affidavit of probable cause that Pease and Girard signed.

Donahue filed a suppression motion prior to trial. He argued that the electronic surveillance had been initiated and maintained in a manner that violated the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 PA.

5

CONST. STAT. ANN. SS 5701–5748. After the suppression
motion was denied, Donahue proceeded to trial before a
jury.

Bieber was one of the prosecution witnesses at that trial.
He testified about his extensive drug dealings with
Donahue, including the aforementioned delivery of 16
pounds of marijuana on November 7, 1990. The jury
convicted Donahue of all the charges against him.

On direct appeal, the Pennsylvania Superior Court
reversed and ordered a new trial. That court held that,
given Bieber's testimony, the trial court committed
reversible error in not giving a "corrupt source" jury
instruction. Commonwealth v. Donahue, 630 A.2d 1238,
1246–47 (Pa. Super. 1993).7 However, the court rejected all
of Donahue's other arguments, including his argument that
his suppression motion should have been granted because
the electronic surveillance was contrary to law. Id. at 278–
281.8 Donahue's Petition for Allowance of Appeal to the
Pennsylvania Supreme Court was denied. Donahue v.
Commonwealth, 645 A.2d 1316 (Pa. 1994).

In January of 1997, the Berks County Court of Common
Pleas dismissed the corrupt organizations charges against
Donahue based upon intervening changes in the applicable
case law. At that point, Donahue had already spent more
than two and one-half years in prison on his sentence. The
Berks County District Attorney concluded that Donahue
would not receive any additional incarceration if he were to
be convicted in a retrial pursuant to the Superior Court's

_____

7. The Superior Court held that "It is reversible error for a trial court
not
to give an accomplice charge if the evidence permits an inference that a
witness was an accomplice." 630 A.2d at 1247 (citation omitted).

8. In its opinion, the Superior Court noted that Donahue alleged in his
appeal that the violations of the Wiretap Act were constitutional
violations. However, the Superior Court found that"no constitutional
claims were preserved in post-verdict motions. We therefore deem any
constitutional claims in this regard to be waived for our review." 630
A.2d at 1248. Consequently, "grounds for suppression . . . are limited to
incriminating evidence resulting from a wiretap based on an interception
which was unlawful or otherwise conducted in contravention of judicial
order, or because the judicial order was insufficient on its face." Id.

remand. Accordingly, the Assistant District Attorney who was then assigned to the case asked the trial court to enter a nolle prosequi ("nol pros"), thereby terminating the prosecution. The state court granted that request, and those charges that remained after the remand were dismissed.

## II. DISTRICT COURT PROCEEDINGS

### A. The 1995 Action.

In April of 1995, Donahue filed a two-count complaint in the district court pursuant to 42 U.S.C. S 1983. He sought monetary damages against Berks County as well as Yatron, Gavin, Pease, and Girard, based upon the electronic surveillance that had been conducted during the 1990-91 investigation and prosecution. In Count I of his complaint, he alleged an illegal search and seizure in violation of the Fourth, Fifth and Fourteenth Amendments. Count II alleged violations of the Pennsylvania Wiretapping and Electronic Surveillance Act, 18 PA. CONST. STAT. ANN. SS 5701-5748.

The defendants moved for summary judgment or dismissal under Fed. R. Civ. P. Rule 12(b)(6), based upon the applicable statutes of limitations. The district court agreed, and entered orders dismissing the suit on January 4, 1996. Donahue did not appeal.

### B. The 1998 Action.

In 1998, Donahue filed another civil action based upon the aforementioned investigation and prosecution. The complaint asserted: a S 1983 Fourth Amendment claim for malicious prosecution against Berks County, Yatron, Gavin, Pease and Girard (Count 1); a S 1983 Fourth Amendment illegal search and seizure claim against D.A. Gavin, Assistant D.A. Yatron, several Troopers involved in the electronic monitoring, including Pease and Girard, Pennsylvania Deputy Attorney General Richard Patton, First Savings Bank of Perkasie, First Savings employee Robert Schwartz and Berks County (Count II);9 a S 1983

_____

9. Donahue sued the bank and its employee because the bank gave the state police information about Donahue's bank accounts during the investigation.

7

deprivation of property claim against Patton, Schwartz and First Savings (Count III);[10] claims for a violation of the Right to Financial Privacy Act, 12 U. S. C. SS 3401-3422, against First Savings and Loan and an employee of that bank [11] (Count IV); and various claims of violations of the Pennsylvania Wiretapping and Electronic Control Act against Gavin, Yatron, Pease, Patton, Trooper Jeffrey Hawbecker and Montgomery County District Attorney Michael Marino (Counts V-VIII).

The defendants filed various motions to dismiss under Fed. R. Civ. P. 12(b)(6) and for judgment on the pleadings under Fed. R. Civ. P. 12(c). By Memoranda and Orders dated December 8, 1998 and March 12, 1999, the district court dismissed all but one claim and most of the defendants. See Donahue v. Gavin, 1999 WL 165700 (E. D. Pa. 1999). The court held that all federal claims for unlawful search and seizure against Berks County, Yatron, Gavin, Pease and Girard were precluded both by the judgment in the 1995 action and by the applicable statutes of limitations. It also ruled that all claims under the Pennsylvania Wiretapping and Electronic Surveillance Control Act were barred by the statute of limitations.

As a result of that ruling, the only claim remaining was Count I - the S 1983 claim for malicious prosecution under the Fourth Amendment. However, the district court ruled that that claim could only be asserted against Berks County, Yatron, Gavin (the "County Defendants") and Pease and Girard (the "State Defendants"), and the suit proceeded to discovery. At the close of discovery, all of the remaining defendants moved for summary judgment. The County Defendants argued that they had either absolute or qualified immunity. The State Defendants argued that Donahue could not establish a Fourth Amendment violation as a matter of law, and that even if he could, they were also entitled to qualified immunity.

Donahue opposed the defendants' summary judgment
_____

10. Donahue ultimately withdrew Count III.

11. Police obtained financial information about Donahue from the bank during the course of the investigation.

8

motions and also filed a motion to suppress all of the evidence derived from the electronic surveillance. He argued that suppression was required because the wiretap evidence was obtained in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. SS 2510-2520. The district court granted each of the defendants' motions for summary judgment. The court held that the County Defendants had absolute immunity and that the State Defendants had qualified immunity. Donahue v. Gavin, 2000 WL 772819 (E. D. Pa. 2000).

This appeal followed. Donahue only appeals the grant of summary judgment in favor of the State and County Defendants on the S 1983 malicious prosecution claim.12 No other issues are before us.

III. DISCUSSION

A.

The essence of Donahue's S 1983 malicious prosecution suit against the State Defendants is that Pease and Girard lacked probable cause to initiate the criminal proceedings against him. Similarly, the essence of his S 1983 malicious prosecution claim against the County Defendants is that Yatron and Gavin did not have probable cause to prosecute him. As noted, both the County Defendants and the State Defendants asserted qualified immunity.13

Donahue attempts to establish this absence of probable cause in a unique manner. He asks the court to suppress the very evidence that would be relevant to determining if the defendants had probable cause. He argues that the suppression remedy contained in Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.

_____

12. Our review of the district court's grant of summary judgment is plenary. Gallo v. City of Philadelphia, 161 F.3d 217, 221 (3d Cir. 1998).

13. The County Defendants also raised the defense of absolute immunity to all acts undertaken in their decision to prosecute Donahue and to all acts taken in preparation necessary to present their case. See 2000 WL 772819 at * 3.

9

SS 2510-2520,14 is not restricted to criminal prosecutions.
See Br. of Appellant, 17-20. Accordingly, Donahue claims
that the district court should have ruled on his suppression
motion before determining whether defendants were
protected by any form of immunity. He argues:

> The motion to suppress should have been ruled upon
> -- and granted -- first. The Court should not have
> considered the wiretap evidence in ruling on the
> summary judgment motions because Defendants
> obtained and used this material illegally.

Id. at 16.

B.

Government officials exercising discretionary functions
have qualified immunity from suits seeking damages under
S 1983 "insofar as their conduct does not violate clearly
established statutory or constitutional rights of which a
reasonable person would have known." Harlow v.
Fitzgerald, 457 U. S. 800, 818 (1982); see also Wilson v.
Russo, 212 F.3d 781, 786 (3d Cir. 2000) ("According to the
doctrine of qualified immunity, law enforcement officers
acting within their professional capacity are generally
immune from trial insofar as their conduct does not violate
clearly established statutory or constitutional rights of
which a reasonable person would have known.")(citations
and internal quotations omitted).15

_____

14. For example, Donahue argues: "[d]espite . . . assertions contained in
their applications and supporting affidavits that there was probable
cause to support the approval of the proposed wiretap order, Pease has
since admitted the lack of probable cause." Appellant's Br. at 4.

"Defendants falsely stated that Pease and Girard were qualified to
conduct the wiretaps, when they were not." Id. "Pease and Girard falsely
swore that all conventional investigative techniques (such as physical
surveillance) had been either exhausted or were impossible to use. . . .
In fact, they were had not even attempted to use any conventional
investigative techniques." Id. Donahue also claims that "Gavin played a
large role in supporting and directing the investigation, . . . ." Id. at
6.

15. In Imbler v. Pachtman, 424 U. S. 409, 430 (1976), the Supreme Court
extended absolute immunity to prosecutors when their"activities were

10

As noted above, the district court decided this case on grounds of the defendants' immunity and concluded that it did not need to address the applicability of Title III's suppression remedy. Although we agree that the defendants are entitled to judgment, we conclude that the district court should not have reached the issue of the defendants' qualified immunity without first addressing whether Donahue even alleged a civil rights claim. The Supreme Court has held that courts must "determine first whether the plaintiff has alleged a deprivation of a constitutional right at all" when a government official raises qualified immunity as a defense to an action under S 1983. County of Sacramento v. Lewis, 523 U. S. 833, 842 n.5 (1998).

_____

intimately associated with the judicial phase of the criminal process." More specifically, the Court held that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under S 1983." Id. at 431. Therefore, a prosecutor is absolutely immune when acting as an advocate in judicial proceedings. Kalina v. Fletcher, 522 U. S. 118, 125 (1997). However, "a prosecutor acting in an investigative or administrative capacity is protected only by qualified immunity." Kulwicki v. Dawson, 969 F.2d 1454, 1463 (3d Cir. 1992)(citations omitted). "In determining whether absolute immunity is available for particular actions, the courts engage in a `functional analysis' of each alleged activity." Id. (citations omitted). "The decision to initiate a prosecution is at the core of a prosecutor's judicial role." Id.
Thus, "[a] prosecutor is absolutely immune when making this decision, even where he acts without a good faith belief that any wrongdoing has occurred." Id.

Donahue concedes that the County Defendants have absolute immunity with regard to their actions during the judicial phase of his prosecution. However, he attempts to circumvent that immunity by alleging that they engaged in misconduct in the investigative phase. More particularly, he points to their roles in gathering evidence, his allegation that they fabricated evidence, his allegations of false swearing on an arrest warrant, his allegations of their covering up the illegal wiretaps and his allegations that they made false statements in press conferences they held. "Evidence obtained at or after the filing is likely to be connected with an existing prosecution, and is absolutely protected." Kulwicki, 969 F.2d at 1465. However, a prosecutor is not entitled to absolute immunity when holding a press conference, or when he allegedly fabricated evidence concerning an unsolved crime. Kalina, 522 U.S. at 126.

11

Accordingly, in Sherwood v. Mulvihill, 113 F.3d 396 (3d Cir. 1997), we stated:

> Where a defendant asserts a qualified immunity defense in a motion for summary judgment, the plaintiff bears the initial burden of showing that the defendant's conduct violated some clearly established statutory or constitutional right. Only if the plaintiff carries this initial burden must the defendant then demonstrate that no genuine issue of material fact remains as to the objective reasonableness of the defendant's belief in the lawfulness of his actions. This procedure eliminates the needless expenditure of money and time by one who justifiably asserts a qualified immunity defense from suit.

Id. at 399 (citations omitted, and internal quotation marks omitted)(emphasis added).

Determining whether plaintiff has alleged a violation of a statutory or constitutional right is, therefore, the threshold issue, and the Supreme Court has clearly instructed that we must not "assum[e], without deciding, this preliminary issue." Seigert v. Gilley, 500 U. S. 226, 232 (1991). Thus, the district court should only have considered the defendants' claim of immunity if Donahue first established that their conduct violated a clearly established statutory or constitutional right. Wilson v. Russo, 212 F.2d at 786 (courts "should . . . proceed to determine whether that right was clearly established at the time of the alleged violation."). Accordingly, "we begin [our analysis] with the predicate question of whether [Donahue's] allegations are sufficient to establish a violation of a constitutional right at all." Sherwood,113 F.3d at 399 (citations and internal quotations omitted).

C.

Prior to 1994, we allowed plaintiffs to bring malicious prosecution claims under S 1983 by alleging the common law elements of the tort. See Lee v. Mihalich , 847 F.2d 66, 69–70 (3d Cir. 1988). In order to prove malicious prosecution under Pennsylvania law the plaintiff had to prove: (1) the defendants initiated a criminal proceeding; (2)

12

the criminal proceeding ended in plaintiff 's favor; (3) the proceeding was initiated without probable cause; and (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice. Hilfirty v. Shipman, 91 F.3d 573, 579 (3d Cir. 1996)(citing Haefner v. Burkey, 626 A.2d 519, 521 (Pa. 1993)). We had always assumed that by proving a violation of the common law tort, the plaintiff proved a violation of substantive due process that would support a S 1983 claim for malicious prosecution suit. See Gallo v. City of Philadelphia, 161 F.3d 217, 221 (3d Cir. 1998)(citing Lippay v. Christos, 996 F.2d 1490, 1502 (3d Cir. 1993)).

However, the Supreme Court's decision in Albright v. Oliver, 510 U. S. 266 (1994), significantly changed that legal landscape. There, Albright was released on bail after surrendering on an outstanding arrest warrant. The criminal prosecution was ultimately dismissed because the charges did not constitute an offense under state law. Thereafter, Albright filed a S 1983 action against Oliver, the police officer who had obtained the arrest warrant. Albright claimed that Oliver had deprived him of his Fourteenth Amendment substantive due process right to be "free from criminal prosecution except upon probable cause." Id. at 269.

Chief Justice Rehnquist, writing for a plurality of four justices, noted that Albright's claim was "a very limited one" that did not raise procedural due process or Fourth Amendment claims. Id. at 271. The plurality then commented that "as a general matter, the Court has always been reluctant to expand the concept of substantive due process, preferring, instead, to limit substantive due process protections to matters relating to marriage, family, procreation, and the right to bodily integrity." Id. at 271–72. Consequently, the plurality believed that Albright's claim "to be free from prosecution except on the basis of probable cause is markedly different" from the generally recognized type of substantive due process protections" and held that "[w]here a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process,

13

must be the guide for analyzing these claims." Id. at 272, 273.

Accordingly, the plurality held that "substantive due process, with its scarce and open-ended guideposts," provided no relief. Id. at 275. However, while the plurality "express[ed] no view" as to whether the Fourth Amendment would provide relief to Albright, it intimated that Albright could have obtained some relief under the Fourth Amendment had he raised that issue. Id. at 274. Other members of the Court agreed. Id. at 814-817 (Ginsburg, J., concurring in judgment); id. at 281 (Kennedy, J., concurring in judgment and joined by Thomas, J.); id. at 288-89 (Souter, J., concurring in judgment).

In Gallo v. City of Philadelphia, supra, we had our first opportunity to consider Albright's impact upon our S 1983 malicious prosecution jurisprudence. There, a federal grand jury indicted Gallo for arson. "He never was arrested, detained, or handcuffed" following indictment, but certain restrictions were imposed upon him in lieu of bail. 161 F.3d at 219. Gallo subsequently discovered that the local fire marshal had altered his original report so as to suggest that a fire at Gallo's warehouse had been caused by arson rather than a faulty electrical appliance. The fire marshal had also changed his report to corroborate that accusation.

Gallo was acquitted after his defense counsel vigorously cross-examined the fire marshal about the discrepancies in his report. Following his acquittal, Gallo brought aS 1983 civil rights action against the fire marshal and others who had been involved in his prosecution. He alleged that the defendants "had caused the federal government to prosecute him without probable cause." 161 F3d at 220.

The district court construed Gallo's S 1983 action as one for malicious prosecution and held that, under Albright, Gallo must show a Fourth Amendment violation in order to prove the malicious prosecution constituted a constitutional injury. However, inasmuch as Gallo was never detained on the charges, he could not establish a constitutional injury.

On Gallo's appeal, we noted that the Court in Albright "left open the possibility that Albright could have succeeded

14

if he had relied on the Fourth Amendment." 161 F.3d at 222. We then wrote that

> [b]y stating that `the accused is not entitled to judicial oversight or review of the decision to prosecute,' Albright implies that prosecution without probable cause is not, in and of itself, a constitutional tort. Instead, the constitutional violation is the deprivation of liberty accompanying the prosecution. Thus, . . . a plaintiff asserting a malicious prosecution claim must show some deprivation of liberty consistent with the concept of seizure.

Id. (citations and certain internal quotations omitted)(emphasis added). Continuing our analysis, we noted that because "under the common law, the tort of malicious prosecution concerns perversion of legal procedures," Gallo was required to "show that he suffered a seizure as a consequence of a legal proceeding." Id. We concluded that the post-indictment restrictions placed on Gallo's liberty constituted a seizure. Consequently, we reversed the district court and remanded for further proceedings.[16] Id. at 225.

Eight days after we decided Gallo, we once again had occasion to view a S 1983 malicious prosecution suit through the lens of Albright. In Torres v. McLaughlin, 163 F.3d 169 (3d Cir. 1998), we held, inter alia, that post-conviction incarceration is not a seizure within the meaning of the Fourth Amendment and, therefore, post-conviction incarceration cannot constitute a Fourth Amendment violation. Id. at 173-175.

Officer McLaughlin arrested Torres after the officer claimed to have seen Torres selling cocaine. The next day, the district attorney issued a criminal complaint charging Torres with unlawful possession of cocaine with intent to deliver. McLaughlin was the only prosecution witness at trial. Torres testified on his own behalf, denied the charges

_____

16. We remanded because the district court did not rule on whether Gallo had satisfied the common law elements of a malicious prosecution claim or whether certain of the defendants were entitled to qualified immunity. 161 F.3d at 220.

15

and argued that McLaughlin should not be believed. The jury believed McLaughlin and Torres was convicted, and sentenced to three to six years in prison.

About seven and one-half months later, Torres moved for a new trial. The state did not oppose the motion and told the court that if a new trial was granted, the state would ask the court to enter a nol pros and terminate the case. The change of heart resulted from information that suggested that McLaughlin lied in obtaining a search warrant in an unrelated case. The state had since learned that McLaughlin was a "rogue cop" and had moved to nol pros 53 other cases in which McLaughlin had been an essential witness. The court granted Torres' motion, and the charges were dismissed pursuant to the nol pros that the court entered pursuant to the prosecution's request.

Thereafter, Torres filed a S 1983 action in the district court. His suit included a claim that the conduct of McLaughlin and others constituted malicious prosecution in violation of the Fourth Amendment. McLaughlin argued that he was entitled to qualified immunity on theS 1983 claim and moved for summary judgment. The district court denied the motion, and McLaughlin appealed.17 McLaughlin argued to us that Torres' prosecution did not amount to a constitutional violation, or, in the alternative, that he was entitled to qualified immunity for any violation that may have occurred.

The only issue before us was Torres' Fourth Amendment claim, which we characterized "as a claim based on McLaughlin's role in initiating the prosecution by conveying false information to the prosecutor." Torres, at 172. We stressed that "[t]he harm resulting from this action is Torres's incarceration after the jury found him guilty." Id. We then inquired into whether "Torres's post-conviction incarceration was a Fourth Amendment seizure." Id. at 173-74 (emphasis added). After discussing Albright and related cases, we concluded that:

_____

17. "[A]n order rejecting the defense of qualified immunity at either the dismissal stage or the summary judgment stage is a`final' judgment subject to immediate appeal." Behrens v. Pelletier, 516 U. S. 299, 307 (1996).

16

the limits of Fourth Amendment protection relate to the boundary between arrest and pretrial detention. At most, there may be some circumstances during pre-trial detention that implicate Fourth Amendment rights; however, we refer to the Fourth Amendment as applying to those actions which occur between arrest and pre-trial detention. See United States v. Johnstone, 107 F.3d 200, 206-07 (3d Cir.1997) (commenting that "[w]here the seizure ends and pre-trial detention begins is a difficult question"). Therefore, consistent with our language in Johnstone, we conclude that post-conviction incarceration cannot be a seizure within the meaning of the Fourth Amendment, and Torres's incarceration did not violate his Fourth Amendment rights.

Id. at 174 (emphasis added).

It was not appropriate to inquire into qualified or absolute immunity because Torres had not alleged a Fourth Amendment violation. Id. at 174-75. Accordingly, we reversed and directed the district court to enter summary judgment in favor of McLaughlin on Torres's Fourth Amendment claim for malicious prosecution. Id. at 175. That is precisely the situation posed by Donahue'sS 1983 claim for malicious prosecution.

Albright, Gallo and Torres are clearly implicated here because Donahue's S 1983 malicious prosecution action is grounded in the Fourth Amendment. His complaint alleges: "[t]he defendants Berks County, Yatron, Gavin, Girard and Pease violated Donahue's right to be free of malicious prosecution by state actors under color of law pursuant to the 4th Amendment." Complaint, P 165. However, Donahue is attempting to recover for post-conviction losses. The district court properly noted:

> [p]laintiff alleges in his complaint that"defendants Berks County, Yatron, Gavin, Girard, and Pease violated his right to be free of malicious prosecution ... pursuant to the Fourth Amendment." Compl. P 165. He seeks damages for, among other items, the two years and nine months he was incarcerated in state prison after his conviction. Id. at P 174.

17

2000 WL 772819, *3 (emphasis added). However, damages for post-conviction injuries are not within the purview of the Fourth Amendment.

Donahue's brief cites neither Torres nor Gallo, and his only mention of Albright offers little support for his position in view of the holdings in those cases. He refers to Albright only by way of arguing its "doctrinal shift . . . in the law of malicious prosecution." He argues "[b]efore Albright, malicious prosecution claims were regularly understood to be grounded in the Fourteenth Amendment Due Process Clause . . . Since Albright . . . malicious prosecution claims have been most often understood as Fourth Amendment violations." Appellant's Br. at 23. However, he does not begin to establish the required nexus between the alleged Fourth Amendment violation and the damages he alleges.

After noting that Donahue is attempting to recover for post-conviction injuries, the district court correctly stated: "[Donahue] is unable to recover damages for post-conviction incarceration based upon any alleged Fourth Amendment violation." (citing Torres, 163 F.3d at 173-74). 2000 WL at *3. We agree. In fact, we need only substitute the names of the plaintiffs to show how neatly Donahue's claim is refuted under the holding in Torres. In Torres, we stated: "[t]his case, however, concerns the other end of the Fourth Amendment continuum -- post-conviction incarceration. Although Fourth Amendment seizure principles may in some circumstances have implications in the period between arrest and trial, we conclude that [Donahue's] posttrial incarceration does not qualify as a Fourth Amendment seizure." Torres, 163 F.3d at 174.

Donahue alleges he became

> ill emotionally and physically by the defendants' egregious misconduct -- he has lost his reputation, his family, his home, his savings, and other property, the respect and confidence of the community in which he lives, his investment in his education, and his business and career (he has lost future earnings in excess of $2,000,000) and was forced to spend over 2 years and 9 months in prison only to find that he incurred debt beyond his control due to the defendants' unlawful conduct.

18

Complaint at P 174 (emphasis added).

Like Gallo, Donahue can establish a Fourth Amendment seizure, and he may have incurred some "injury" as a result of that seizure. However, even at this late date, he makes no attempt to distinguish between damages that may have been caused by that "seizure", and damages that are the result of his trial, conviction and sentence. Consequently, he has not even attempted to establish the Fourth Amendment violation that is the condition precedent to establishing his malicious prosecution claim.

We realize, of course, that modern rules of pleading do not require a great deal of specificity. See Frazier v. Southeastern Pennsylvania Transportation Authority, 785 F.2d 65, 68 (3rd Cir. 1986) (discussing "the specificity requirement in civil rights cases" for purposes of Fed. R. Civ. P. 8.). However, the defect in Donahue's complaint is not that he has pled a cause of action with inadequate specificity. Rather, it is that the specificity he has pled reveals that he is trying to recover for injuries that are unrelated to the constitutional guarantee his claim is predicated upon. See Torres, 163 F.3d at 174.

Accordingly, we are constrained to hold that Donahue has not met his burden of demonstrating that the defendants' "conduct violated some clearly established statutory or constitutional right." Sherwood , at 399. The district court noted this defect and stated: "[s]ince I need not decide the issue, . . .[ ] I express no view as to whether plaintiff 's post-conviction incarceration violates some other constitutional provision, such as the procedural component of the Due Process clause[ ]." 2000 WL 772819. However, Donahue's S 1983 action is limited to a Fourth Amendment violation based upon malicious prosecution. We need go no further.18

_____

18. In Torres, we read Albright as "standing for the broader proposition that a section 1983 claim may be based on a constitutional provision other than the Fourth Amendment," including "procedural due process or other explicit text of the Constitution." 163 F.3d 172, 173. However, because Donahue's S 1983 malicious prosecution claim is based only on the Fourth Amendment it ought not to be analyzed under procedural due process notions, or on any other explicit constitutional guarantee.

19

However, even if we overlook this defect in Donahue's cause of action and assume arguendo that some unidentified (and unidentifiable) quantum of his damage claim results solely from his seizure and pretrial detention, we would still be constrained to find that he has not established the tort of malicious prosecution. "One element that must be alleged and proved in a malicious prosecution action is the termination of the prior criminal proceeding in favor of the accused." Heck v. Humphrey, 512 U.S. 477, 512 (1994).[19]

Section 659 of the RESTATEMENT (SECOND) OF TORTS (1976) provides: "[c]riminal proceedings are terminated in favor of the accused by

> (a) a discharge by a magistrate at a preliminary hearing, or

> (b) the refusal of a grand jury to indict, or

> (c) the formal abandonment of the proceedings by the public prosecutor, or

> (d) the quashing of an indictment or information, or

> (e) an acquittal, or

> (f) a final order in favor of the accused by a trial or appellate court.

(emphasis added).[20] "The usual method by which a public prosecutor signifies the formal abandonment of criminal proceedings is by the entry of a nolle prosequi. " Id. S 659, com. c, illus. e. As noted above, the trial court entered a nol pros here. However, while "a grant of nolle prosequi can be sufficient to satisfy the favorable termination requirement for malicious prosecution, not all cases where the prosecutor abandons criminal charges are considered to have terminated favorably." Hilfirty v. Shipman, 91 F.3d at 579-580. A nol pros signifies termination of charges in favor of the accused "only when their final disposition is such as to indicate the innocence of the accused" Id. S 660, cmt. a

_____

19. Heck was decided just four months after Albright.

20. The Pennsylvania Supreme Court adopted S 659 in Haefner v. Burkey, 626 A.2d 519, 521 (Pa. 1993).

(emphasis added) Accordingly, in Hector v. Watt , 235 F.3d 154, 156 (3d Cir. 2000), we stated that a S 1983 malicious prosecution plaintiff "must be innocent of the crime charged in the underlying prosecution."

As noted above, the charges against Donahue were dismissed pursuant to a nol pros in part because of a change in the law of corrupt organizations. The state had the option of retrying Donahue on the remaining drug distribution and conspiracy charges but elected not to. The Berks County District Attorney filed a motion which stated:

> In an opinion dated August 27, 1993, the Superior Court reversed the judgment of sentence and remanded for a new trial due to the failure of the .. . trial judge . . . to give a "corrupt and polluted source" charge to the jury. Upon remand for the new trial, all seized drugs which relate to the corrupt organization charges became irrelevant to the remaining charges of possession of marijuana and possession of marijuana with intent to deliver and criminal conspiracy because of a subsequent decision of the Supreme Court of Pennsylvania which required the trial court to dismiss the corrupt organization charges. Certain intercepted conversations then became irrelevant because they did not pertain to the remaining charges. In addition, the defendant has already served approximately 2 years, 7 months and 23 days, and if convicted, the defendant would most likely not receive any additional jail time. Therefore, in the interest of judicial economy and to preserve scarce judicial resources, the Commonwealth of Pennsylvania, in exercising its prosecutorial discretion, requests entry of a Nolle Prosequi Order.

App. at 1308 (emphasis added).

It is clear from even a cursory reading of the request for a nol pros that the resulting dismissal can hardly be described as "indicat[ing] the innocence of the accused." The prosecutor simply reasoned that Donahue was not likely to receive any additional jail time if convicted in a retrial, and concluded that further prosecution was therefore not an appropriate use of limited resources. Far from indicating Donahue's innocence, the nol pros merely

reflected an informed and reasoned exercise of prosecutorial discretion as to how best to use those limited resources. It does not suggest that Donahue was innocent of the remaining criminal charges. Accordingly, there is no way that Donahue can establish the malicious prosecution that is necessary to establishing the constitutional violation he has alleged as the basis of his S 1983 civil rights claim, and the defendants are entitled to judgment for that reason.

IV.

For all of the above reasons, we will affirm the judgment of the district court.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

22