David GENZLER, Plaintiff–Appellee,

v.

Peter J. LONGANBACH, Defendant–
Appellant,

and

Jeffrey O'Brien; County of San Diego, a
governmental entity; San Diego
County District Attorney's Office;
Gregory Thompson; James Pippen;
Paul Pfingst, Defendants.

David Genzler, Plaintiff–Appellee,

v.

Peter J. Longanbach; County of San
Diego, a governmental entity; San Di-
ego County District Attorney's Office,
Defendants,

and

Jeffrey O'Brien; Gregory Thompson;
James Pippen; Paul Pfingst,
Defendants–Appellants.

Nos. 02–56572, 02–56573.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 2, 2003.

Filed Sept. 27, 2004.

Robert L. Young, Edward Patrick Swan, Jr., Luce, Forward, Hamilton and Scripps, San Diego, CA, Jeffrey G. Carver, San Diego, CA, and Morris G. Hill, Office of the County Counsel, San Diego, CA, for the appellants.

Patrick L. Hosey, Hosey & Bahrambey-gui, San Diego, CA, for the appellee.

Before: PREGERSON, COWEN,* and W. FLETCHER, Circuit Judges.

* The Honorable Robert E. Cowen, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

WILLIAM A. FLETCHER, Circuit Judge.

Plaintiff David Genzler seeks damages under 42 U.S.C. § 1983 for violations of his constitutional rights during the investigation and prosecution of his state criminal homicide trial. Defendants San Diego County Deputy District Attorney Peter Longanbach and Investigator Jeffrey O'Brien appeal from the partial denial of their motions for summary judgment based on absolute official immunity. Defendant supervisors in the San Diego County District Attorney's Office—District Attorney Paul Pfingst, Assistant District Attorney Gregory Thompson, and Deputy District Attorney James Pippen—appeal the district court's complete denial of their motion for summary judgment based on absolute and qualified immunity.

We affirm the district court's partial denial of Longanbach's and O'Brien's motions. Evaluating the timing and nature of their conduct, we conclude that there is a genuine issue of material fact about whether they were engaged in advocacy intimately associated with the judicial process when they interviewed a key witness, Sky Blue Flanders. However, we reverse the district court's denial of the supervisors' motion for summary judgment because we conclude that there is no genuine dispute that their involvement in prosecutorial decisions was advocacy intimately associated with the judicial process.

## I. Factual Background

The underlying homicide giving rise to this § 1983 suit occurred on April 18, 1996, when David Genzler stabbed Dustin Harless during a fight. On April 19, Genzler learned from a television news report that Harless had died from the stabbing. Genzler turned himself into the police and was arrested that day. After the arrest, Deputy District Attorney Longanbach and Investigator O'Brien were assigned to the case.

A criminal complaint was filed in Municipal Court on April 23, 1996, and Genzler's bail hearing was held on April 29. On May 23, a preliminary hearing was held in Municipal Court, and the judge found probable cause to bind the case over for trial. The criminal complaint was filed in Superior Court on May 24.

The prosecution filed a pre-trial motion to compel production of evidence from the defense. At the hearing on this motion, Genzler's ex-girlfriend, Sheri Logel, testified under a grant of immunity that she had given a box of bloody clothing and a knife to Gerald Blank, Genzler's retained counsel. Blank said he had received the clothing and given it to the prosecution, but he denied receiving the knife. Longanbach then moved to recuse Blank as Genzler's counsel. At the hearing on this recusal motion, Logel testified that she had lied about delivering the knife to Blank. The trial judge granted the recusal motion after Longanbach said he planned to call both Logel and Blank as witnesses at Genzler's trial. In a letter she later wrote to Genzler, Logel claimed that Longanbach had pressured her to testify falsely about her communication with Blank.

After trial, a jury convicted Genzler of the second degree murder of Harless. This conviction, however, was reversed by the California Court of Appeal on the ground that the trial judge had improperly recused Blank. The Court of Appeal also held that Genzler was entitled to a jury instruction on involuntary manslaughter because there was sufficient evidence to support a finding of imperfect self-defense. Genzler had also alleged prosecutorial misconduct in his first trial, but the Court of Appeal did not reach this issue. The San Diego District Attorney's office recused

itself from Genzler's second trial, and Genzler was prosecuted by the State Attorney General's office. On retrial, a second jury found Genzler guilty of involuntary manslaughter.

Sky Blue Flanders, Harless's fiancée, was a key witness for the prosecution in both trials. On the day of the stabbing, Flanders had told the police that Genzler had approached her in his car while she was walking across the street and had asked her if she wanted a ride. Harless, according to Flanders, was zipping up his jacket on the other side of the street when Genzler first spoke to her. She told police that Harless had then crossed the street and knocked on Genzler's window. As Flanders described the events to police that day; Genzler got out of the car, Harless and Genzler exchanged punches, Harless "flipp[ed]" Genzler to the ground, and Genzler stabbed Harless while Harless held Genzler on the ground. Flanders also told police that day that Harless was a skilled wrestler who had been involved in previous street fights. Police audio- and video-taped the interview with Flanders. Flanders testified in a later hearing that she had repeated this version of events—in which Harless was on top of Genzler when Genzler stabbed him—to about 20 other people in the days following Harless's death.

Sometime after Flanders spoke with police on the day of the homicide, she met with Deputy District Attorney Longanbach and Investigator O'Brien. She met once separately with O'Brien sometime during the week before April 29, and once with Longanbach and O'Brien together on April 29. After these meetings, Flanders changed her story. She testified at the preliminary hearing on May 23 and at both trials that she remembered little of the actual fight because she was distracted by the arrival of Scott Davis, the doorman at the bar Flanders and Harless had left just before the stabbing. Flanders further testified that she thought she remembered seeing Davis pulling Genzler off Harless after the stabbing.

In her testimony during Genzler's second trial, Flanders admitted that she had "answer[ed] evasively" in the first trial about whether Harless had ever been involved in past fights and explained that she had tried to answer questions to make it seem that she was only aware of Harless's participation in organized wrestling matches, not of his past history of street-fighting. She also testified in the second trial that she had felt pressure from Longanbach and O'Brien not to disclose Harless's history of street-fighting.

Davis, the doorman, testified at the preliminary hearing and at both trials. In his interview with police the day after the homicide, Davis stated that he witnessed Genzler jump out of his car and chase Harless and Flanders as they walked away from him, hand-in-hand. This account was manifestly inconsistent with the account Flanders had given police on the day of the homicide. Davis then met with O'Brien on April 25, and changed his story. In a report summarizing this April 25 meeting, O'Brien wrote that, "upon reflection," Davis considered that he had not seen the couple walking away from him hand-in-hand. At the May 23 preliminary hearing, Davis testified that Flanders and Harless were standing several feet apart when the fight began.

According to Genzler's version of events, the fight on April 18 began when Harless charged Genzler and punched him in the face. Genzler said that Harless had grabbed him, slammed his face to the ground and pinned his arm, and that Davis then began kicking him in the head. Genzler said that he stabbed Harless to defend himself from the attack.

After the second trial, Genzler was sentenced to six years for involuntary manslaughter. With credit for time already served, he was released on February 14, 2001.

## II. The Present Action

After his release from prison, Genzler brought the present § 1983 action charging the defendants with prosecutorial misconduct both preceding and during his first trial.[1] The defendants moved unsuccessfully to dismiss Genzler's complaint under Federal Rule of Civil Procedure 12(b)(6). They then moved for summary judgment based on official immunity. The district court granted Longanbach and O'Brien's motions for summary judgment except for claims based on an allegation contained in paragraph 66 of Genzler's complaint. This paragraph alleges:

> [Longanbach and O'Brien] suborned perjury. Specifically, prior to the preliminary hearing and during the initial investigation of the incident, Longanbach and O'Brien met with Ms. Flanders and told her that in order to secure a conviction she needed to lie about what she saw on the night of the incident and about Mr. Harless' violent past.

The district court read paragraph 66 to state that Longanbach and O'Brien were engaged in an investigative activity when they convinced Flanders to change her version of the events she witnessed. Relying on our opinion in *Milstein v. Cooley*, 257 F.3d 1004 (9th Cir.2001), the district court considered not only the nature of the defendants' acts but also their timing, and held that Genzler had produced sufficient evidence to create a genuine issue of material fact as to whether Longanbach and O'Brien had pressured Flanders to lie as part of their initial investigation. The district court accordingly denied this part of their motion.

The supervisory defendants also moved for summary judgment based on absolute and qualified immunity. The district court construed their motion to apply only to allegations contained in three paragraphs of the complaint: paragraphs 74, 81, and 82.[2] These paragraphs charged that Pfingst, Thompson, and Pippen knew that Longanbach had granted Logel immunity in exchange for her perjured testimony, and that they had condoned Longanbach's tactics to force recusal of Genzler's counsel. The district court denied the supervisory defendants' motion in its entirety.

1. Because Genzler does not allege conduct that would necessarily imply the invalidity of his conviction after the second trial, this suit is not barred by *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).

2. The specific allegations are:
74. LONGANBACH and O'BRIEN's misconduct did not stop there. On August 22, 1996, at an evidentiary hearing held before the Honorable Joan P. Weber, LONGANBACH granted prosecution witness, Sheri Logel, immunity in exchange for testimony favorable to the prosecution. This grant of immunity included immunity from perjury and *not just from past acts of perjury, but was intended to cover future acts of lying on the stand at the trial of plaintiff.* In essence, LONGANBACH gave Ms. Logel a "get out of jail free card" for lying on the stand. This was done with the knowledge of PFINGST, THOMPSON and PIPPEN.
81. Neither Mr. Blank nor Ms. Logel were called as trial witnesses by LONGANBACH. It [sic] The entire presentation of false evidence and perjured testimony was nothing but an attempt to remove GENZLER's attorney from the case so as to improperly influence the outcome of the case which LONGANBACH had promised PFINGST, THOMPSON, and PIPPEN he would win.
82. LONGANBACH was excited by the recusal ploy he used. It became one of his favorite tactics. He tried the same tactic in other cases and on other attorneys. PFINGST, THOMPSON and PIPPEN were aware of what he was doing and how he was doing it, but continued to condone and ratify his conduct, because it worked.

Longanbach, O'Brien, and the supervisory defendants timely appealed. Whether official immunity applies is a question of law we review de novo. *Milstein*, 257 F.3d at 1007. We have jurisdiction over interlocutory denials of motions for summary judgment based on official immunity "to the extent that [the district court's decision] turns on a question of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *see also Wilkins v. City of Oakland*, 350 F.3d 949, 951 (9th Cir.2003) (quoting *Mitchell* ). We construe all facts in the light most favorable to Genzler, the non-moving party, in deciding whether a dispute of fact is material and thereby precludes summary judgment. *See Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004).

## III. Discussion

■ An official is protected by absolute immunity from liability for damages under § 1983 "when performing the traditional functions of an advocate." *Kalina v. Fletcher*, 522 U.S. 118, 125, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997). Officials are entitled to qualified rather than absolute immunity, however, when they perform administrative or investigative functions. *Id.* at 126, 118 S.Ct. 502; *Burns v. Reed*, 500 U.S. 478, 494–96, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991).

To determine whether an action is administrative, investigative or advocatory, we apply a "functional" analysis. *Burns*, 500 U.S. at 486, 111 S.Ct. 1934. Official immunity depends on "the nature of the function performed, not the identity of the actor who performed it." *Kalina*, 522 U.S. 118, 127, 118 S.Ct. 502, 139 L.Ed.2d 471 (quoting *Forrester v. White*, 484 U.S. 219, 229, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988)). Thus, "the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Buckley*

*v. Fitzsimmons*, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993).

■ A government official's activity involves an advocacy function and is protected by absolute immunity only when that activity is "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Kalina*, 522 U.S. at 125, 118 S.Ct. 502 (quoting *Imbler* ); *Buckley*, 509 U.S. at 270, 113 S.Ct. 2606 (same); *Burns*, 500 U.S. at 479, 111 S.Ct. 1934 (same); *see also Milstein*, 257 F.3d at 1009 (prosecutorial immunity protects "the prosecutor's actions [that] are closely associated with the judicial process") (citing *Imbler* ). Advocatory conduct by the prosecutor that is intimately associated with the judicial phase of the criminal process is sometimes called "quasi-judicial" conduct. *E.g.*, *Broam v. Bogan*, 320 F.3d 1023, 1029 (9th Cir.2003) ("[I]n deciding whether to accord a prosecutor immunity from a civil suit for damages, a court must first determine whether a prosecutor has performed a quasi-judicial function. If the action was part of the judicial process, the prosecutor is entitled to the protection of absolute immunity whether or not he or she violated the civil plaintiff's constitutional rights.") (citation and internal quotation marks omitted).

Absolute immunity protects quasi-judicial conduct such as maliciously initiating a prosecution, using perjured testimony at trial, and suppressing material evidence at trial. *Imbler*, 424 U.S. at 430, 96 S.Ct. 984. A prosecutor is absolutely immune for direct participation in a probable cause hearing, *Burns*, 500 U.S. at 491, 111 S.Ct. 1934, and for preparing and filing charging documents. *Kalina*, 522 U.S. at 130, 118 S.Ct. 502. "To be sure," the *Imbler* Court observed, absolute "immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose

malicious or dishonest action deprives him of liberty." 424 U.S. at 432, 96 S.Ct. 984. Nevertheless, the Court concluded, "the alternative of qualifying a prosecutor's immunity would disserve the broader public interest" in protecting the prosecutor's abilities to exercise independent judgment and to advocate vigorously without the threat of retaliation. *Id.* at 429, 96 S.Ct. 984; *see also Milstein,* 257 F.3d at 1007–08.

The Supreme Court has "been quite sparing in[its] recognition of absolute immunity, and ha[s] refused to extend it any further than its justification would warrant." *Burns,* 500 U.S. at 487, 111 S.Ct. 1934 (citations and quotation marks omitted). In *Buckley,* the Supreme Court denied absolute immunity to prosecutors accused of holding a defamatory press conference—an activity which "had no functional tie to the judicial process." 509 U.S. at 277, 113 S.Ct. 2606. The *Buckley* Court also denied absolute immunity to prosecutors who had fabricated evidence "during the early stage of the investigation" when "police officers and assistant prosecutors were performing essentially the same investigatory functions." *Id.* at 273, 113 S.Ct. 2606. A prosecutor does not have absolute immunity for providing legal advice to police that probable cause exists to arrest a suspect, *Burns,* 500 U.S. at 491, 111 S.Ct. 1934, or for personally attesting to the truth of evidence in support of charging documents. *Kalina,* 522 U.S. at 130, 118 S.Ct. 502.

The Supreme Court has consistently "emphasized that the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Id.* at 486, 111 S.Ct. 1934. Further, "the presumption is that qualified rather than absolute immunity is sufficient to protect government officials in

the exercise of their duties." *Id.* at 486–87, 111 S.Ct. 1934.

### A. Longanbach and O'Brien

#### 1. Witness Interviews: Distinguishing Between Advocacy and Investigation

The claim against Longanbach and O'Brien that survived summary judgment is that "prior to the preliminary hearing and during the initial investigation of the incident ... [they] met with Ms. Flanders and told her that in order to secure a conviction she needed to lie about what she saw on the night of the incident and about Mr. Harless' violent past." As did the district court, we understand this claim to state that as part of their investigation Longanbach and O'Brien coerced or encouraged Flanders to lie.

Witness interviews may serve either an investigative or an advocatory function, as may other methods of gathering or manufacturing evidence prior to trial. *See KRL v. Moore,* 384 F.3d 1105, No. 02–15296, 2004 WL 2169414 (September 27, 9th Cir.2004) (holding that pre-trial evidence gathering intimately associated with the judicial process was protected by absolute immunity, while evidence gathering for a collateral investigation was not). Viewing the evidence in the light most favorable to Genzler, we must decide whether Longanbach and O'Brien were engaged in an advocatory function "intimately associated with the judicial phase of the criminal process" when they met with Flanders, or were engaged in an investigative function. *Imbler,* 424 U.S. at 430, 96 S.Ct. 984; *see also Milstein,* 257 F.3d at 1009; *Broam,* 320 F.3d at 1029. If the former, they are absolutely immune. If the latter, they are entitled only to qualified immunity.

■ If not done in a quasi-judicial capacity, the acquisition or manufacturing of evidence is generally investigatory conduct

not protected by absolute immunity. *Milstein,* 257 F.3d at 1011 ("acquiring known false statements from a witness for use in a prosecution is ... fabricating evidence that is unprotected by absolute immunity"). In *Moore v. Valder,* 65 F.3d 189, 194–95 (D.C.Cir.1995), the D.C. Circuit held that a prosecutor had not met his burden to show that he was entitled to absolute immunity for acts of intimidating and coercing witnesses into changing their testimony before a grand jury. The court held that such activity constitutes

> a misuse of investigative techniques legitimately directed at exploring whether witness testimony is truthful and complete and whether the government has acquired all incriminating evidence. It therefore relates to a typical police function, the collection of information to be used in a prosecution.

*Id.* at 194 (citing *Barbera v. Smith,* 836 F.2d 96, 100 (2d Cir.1987)). We agree with the D.C. Circuit that when a prosecutor engages in behavior typically associated with police work—pursuing leads, exploratory fact gathering, and searching for evidence—the prosecutor's actions are generally more appropriately characterized as "investigative" rather than "quasi-judicial advocacy."

Prosecutors are, however, absolutely immune "for gathering additional evidence after probable cause is established or criminal proceedings have begun *when they are performing a quasi-judicial function.*" *Broam,* 320 F.3d at 1030 (emphasis added). As the Court in *Buckley* explained,

> [t]here is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a

prosecutor performs the investigative functions normally performed by a police officer, it is neither appropriate nor justifiable that, for the same act, [absolute] immunity should protect the one and not the other.

509 U.S. at 273, 113 S.Ct. 2606. A prosecutor gathering evidence is more likely to be performing a quasi-judicial advocacy function when the prosecutor is "organiz[ing], evaluati[ng], and marshaling [that] evidence" in preparation for a pending trial, in contrast to the police-like activity of "*acquiring* evidence which might be used in a prosecution." *Barbera,* 836 F.2d at 100.

The timing of evidence gathering informs how closely connected that conduct is to the official's core advocacy function in the judicial process, and thus informs whether the official's conduct is protected by absolute immunity. The Supreme Court has held that when a witness is being coached at or during a break in trial, the prosecutor is protected by absolute immunity even if he or she is instructing the witness to lie. *Imbler,* 424 U.S. at 430, 431 n. 33, 96 S.Ct. 984; *cf. Herb Hallman Chevrolet, Inc. v. Nash-Holmes,* 169 F.3d 636, 643 (9th Cir.1999) (holding that prosecutors were absolutely immune for interviewing new witnesses during investigative grand jury proceedings, when the majority of other witnesses had been interviewed prior to the initiation of proceedings).

Longanbach and O'Brien rely on the timing of their meetings with Flanders to argue that they are entitled to absolute immunity. They point out that their meetings with Flanders occurred after Genzler's April 19 arrest, which Genzler concedes was based on probable cause. In *Buckley,* the Court held that "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." 509 U.S. at 274, 113 S.Ct. 2606. But the Court in

*Buckley* was careful to note that "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination ... a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." *Id.* at 274 n. 5, 113 S.Ct. 2606. Thus, while interviews conducted before probable cause to arrest has been established are not protected by absolute immunity, the converse is not necessarily true. As the district court correctly observed, the courts have only "draw[n] the line .in the reverse, stating that absolute immunity could not be invoked before probable cause was established." Indeed, in *Robichaud v. Ronan*, 351 F.2d 533, 535 (9th Cir.1969), we held that prosecutors who, soon after the arrest of a suspect, directed police. to coerce a confession from that suspect were not entitled to absolute immunity because their activity was more police-like than prosecutorial.

Timing is a relevant factor as it helps reveal the function Longanbach and O'Brien were performing, but it is not determinative. *See KRL,* 384 F.3d at 1111, 2004 WL 2169414 (citing *Cousin v. Small,* 325 F.3d 627, 636 (5th Cir.2003)); *see also Kulwicki v. Dawson,* 969 F.2d 1454, 1466 (3d Cir.1992). We also focus on whether the nature or character of their meetings was more advocatory or investigative. Because Deputy Attorney General Longanbach and Investigator O'Brien were engaged in slightly different functions, we analyze separately their entitlements to absolute immunity. As all parties acknowledge, it is appropriate to focus on the functions performed by Longanbach and O'Brien, not on their titles.

2. O'Brien's Meeting with Flanders Before April 29

 Viewing the facts in the light most favorable to Genzler, we conclude that O'Brien was engaged in an investigative function, not quasi-judicial advocacy, when he met with Flanders prior to Genzler's bail hearing on April 29, 1996. O'Brien's report indicates that he met with Flanders "several days prior" to April 29. In her testimony during the hearing on Genzler's 2000 motion to dismiss, Flanders estimated that this meeting took place about a week before the April 29 joint meeting with Longanbach and O'Brien. She remembered that she and O'Brien had talked for about an hour, "primarily ... as to the identity of the person who stabbed [Harless]."

Police investigations were still ongoing. At this time, the preliminary hearing at which the judge would decide whether there was probable cause to hold Genzler for trial in superior court was still over a month away. Moreover, it is a supportable conclusion from the evidence that O'Brien's meeting with Flanders took place before the criminal complaint was filed in municipal court on April 23, 1996, and before police finished their investigation and synthesis, which is dated April 24, 1996. *See Kulwicki,* 969 F.2d at 1465 (noting that filing of a criminal complaint is a relevant but not dispositive factor in determining whether an interview involves investigation or advocacy).

The written police synthesis leaves out the initial statement by Flanders to police that Harless was on top of Genzler at one point during the fight. It emphasizes Davis's point of view, but it does not include Davis's story that Flanders and Harless were walking hand-in-hand. If all factual inferences are resolved in favor of Genzler, one could conclude that O'Brien used this interview to change Flanders's story about what she remembered and to make her story more consistent with Davis's story.

Further, the record reflects that during this period, O'Brien was engaged in other work that can only be characterized as investigative. For example, he and Longanbach interviewed Scott Davis on April 25, 1996. The notes from the conversation reflect only a narrative from Davis's point of view about the events of the stabbing. O'Brien joined police Detective Warrick in a meeting on June 3, 1996 with Sheri Logel, Genzler's ex-girlfriend, discussing her story about giving Genzler's knife to Blank, and Genzler's character in general. This conversation, too, was purely investigative in character. On June 5, 1996, O'Brien interviewed Paul Ernst, another witness to the homicide, about what he had seen. Similarly, on June 28, 1996, O'Brien met again with John Belsan, who came forward with evidence about a past fight with Genzler. Again, O'Brien's notes from this conversation reflect only Belsan's narrative about what happened in that confrontation. That O'Brien was engaged in general investigative work during the time he met with Flanders supports an inference that he was also engaged in investigative work when he met with Flanders.

We conclude from the foregoing that there is sufficient evidence in the record to support the conclusion that, during his first meeting with Flanders, O'Brien was, like the prosecutor in *Moore*, engaged in the process of "acquiring" or manufacturing evidence during performance of an investigative function, rather than engaged in quasi-judicial advocacy. At this stage of the proceedings, O'Brien is therefore unprotected by absolute immunity.

■ Absolute immunity does not protect Longanbach if he was directing this investigative activity by O'Brien. *See Joseph v. Patterson*, 795 F.2d 549, 556 (6th Cir.1986) ("a prosecutor who assists, directs, or otherwise participates ... in obtaining evidence prior to an indictment undoubtedly is functioning more in his investigative ca-

pacity than in his quasi-judicial capacities of deciding which suits to bring and conducting them in court") (citation and internal quotation omitted); *Robichaud*, 351 F.2d at 537 (holding that prosecutors are not absolutely immune if they either "committed acts, or authoritatively directed the commission of acts, which ordinarily are related to police activity as opposed to judicial activity"); *cf. Burns*, 500 U.S. at 496, 111 S.Ct. 1934 (prosecutor not entitled to absolute immunity for act of giving legal advice to police). Longanbach cannot, however, be liable for O'Brien's conduct on a theory of vicarious liability for any independent actions taken by O'Brien. *See Monell v. Dep't of Social Servs. of NY*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (respondeat superior not available as theory of liability under § 1983).

There is sufficient evidence in the record to support the conclusion that Longanbach was actively directing O'Brien throughout his work on the Genzler case, including O'Brien's first meeting with Flanders. For example, Flanders testified that Longanbach would give her instructions that O'Brien would then "reiterate." Genzler also introduced a declaration from another Deputy District Attorney stating that "Jeff O'Brien does whatever Mr. Longanbach told him to do." Because the evidence could support a conclusion that Longanbach was actively directing investigative, police-like actions by O'Brien, Longanbach is also not entitled to summary judgment that he is absolutely immune for any action taken with respect to O'Brien's meeting with Flanders before April 29.

### 3. Longanbach and O'Brien's April 29 Meeting with Flanders

■ The next question is whether Longanbach and O'Brien were performing an investigatory or advocatory function in their joint April 29 meeting with Flanders.

We consider first the timing of the conversation. The criminal complaint had been filed by the time of Longanbach and O'Brien's April 29 meeting with Flanders. However, just as the existence of probable cause to arrest is not conclusive, we do not view the filing of the complaint as an event after which, by definition, all actions by the prosecutor and his staff are protected by absolute immunity. The timing of a witness interview is most conclusive when the interview occurs during judicial proceedings, and was oriented toward influencing those judicial proceedings. *See Imbler*, 424 U.S. at 430, 431 n. 33, 96 S.Ct. 984.

The timing of the April 29 meeting does not weigh as much in favor of absolute immunity as did the timing of the search carried out pursuant to a warrant in *KRL*, 384 F.3d at 1112, 2004 WL 2169414. In *KRL*, we held that a prosecutor and his investigator were entitled to absolute immunity for seeking a search warrant and carrying out a search pursuant to that warrant more than three weeks after the grand jury returned an indictment indicating that it had found sufficient evidence for the defendant to stand trial. *Id.* When Longanbach and O'Brien met with Flanders, the preliminary hearing at which the court would determine whether there was probable cause for Genzler to stand trial was still more than three weeks away. On April 29, officials were continuing the process of investigation into the facts that would inform whether there was such probable cause, and the precise charges on which Genzler would stand trial had yet to be determined.

We next consider the nature of the interview with Flanders. The Supreme Court has stated that

acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the court of his [or her] role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include *the professional evaluation of evidence assembled by the police and appropriate preparation for its presentation at trial* or before a grand jury after a decision to seek an indictment has been made.

*Buckley*, 509 U.S. at 273, 113 S.Ct. 2606 (emphasis added); *see also Broam*, 320 F.3d at 1030.

In *KRL*, we held that "to the extent that the second search warrant sought evidence to prosecute the crimes charged in the indictment," the prosecutors' authorization of that warrant and an investigator's subsequent search were protected by absolute immunity. 384 F.3d at 1112, 2004 WL 2169414. We held that the prosecutors and the investigator were acting as advocates to the extent they were reviewing, evaluating, and ensuring the admissibility of evidence in preparation for an already pending trial. *Id.*

There is some evidence in the record that Longanbach and O'Brien were reviewing and evaluating evidence at the April 29 meeting in preparation for the preliminary hearing and trial testimony, including some testimony by Flanders describing the meeting at some of the later proceedings in Genzler's case. However, when we resolve all ambiguity in favor of Genzler and view the evidence in the context of other evidence about ongoing investigations, we conclude that evidence in the record supports the conclusion that Longanbach and O'Brien were engaged in an investigative function during the meeting.

The only notes in the record from the meeting were taken by O'Brien. They are captioned, "Witness Interview." These interview notes, like notes taken of other interviews by O'Brien, record only a narrative of what Flanders reportedly said at the meeting about the events of April 17 and April 18. The notes state that

"FLANDERS had told me during a conversation that took place at her residence several days earlier that she had a clearer picture in her mind of the events surrounding HARLESS' death. She felt that she could relate them in a more organized fashion than she may have done earlier in the investigation." Specifically, the notes state that Flanders was "distracted" by the arrival of Scott Davis, which is inconsistent with the initial statement Flanders made to police. The notes thus reflect that Longanbach and O'Brien were in the process of gathering information from Flanders during the meeting and possibly encouraged her to lie as part of their process. There is little or nothing in the notes to indicate that the meeting focused on coaching Flanders about how to present this information in a court proceeding.

The Fifth Circuit decision in *Cousin*, relied on heavily by Longanbach and O'Brien, is therefore inapposite. In *Cousin*, the Fifth Circuit held that a declaration by a witness who was allegedly coerced and intimidated into lying "eliminate[d]" any "ambiguity" about whether the prosecutor was engaged in an investigatory or quasi-judicial function when he interviewed that witness. 325 F.3d at 633. The declaration clearly showed that when the prosecutor met with the witness, "he did so to tell [the witness] how he should testify." *Id.* Here, by contrast, the interview notes show a process of investigation—or, viewed in the light most favorable to Genzler, a process of manufacturing evidence while performing an investigatory function—not Longanbach or O'Brien acting as advocates by telling Flanders how she should testify. *See Moore*, 65 F.3d at 194.

We therefore agree with the district court that Longanbach and O'Brien are not entitled to summary judgment that they are absolutely immune for their actions during the April 29 meeting with Flanders.

### 4. General Practice in the Prosecutor's Office

We are strengthened in our conclusion that Longanbach and O'Brien are not entitled to summary judgment by evidence in the record describing general investigative practices in the San Diego County District Attorney's office. In a deposition in an unrelated case, which was placed into the record in this case to describe general practices in the San Diego County District Attorney's Office, Assistant District Attorney Gregory Thompson described the importance of performing investigative functions for district attorneys in his office. Thompson stated that "[t]he second [most important skill for a prosecutor] would be what I would refer to as follow-up investigation. Frequently when the—after a preliminary hearing is when we often determine where the holes are in our case, what additional investigation needs to be done."

During trial on the same unrelated case, Thompson provided a description of the critical job skills needed for a district attorney for typical "felony trial preparation," with reference to his own experience in the San Diego County District Attorney's office:

When I refer to "felony trial preparation," I'm using that term in the broadest sense, because as you will see as we walk through this, what we're really talking about is a fact-finding mission that the deputy district attorney is going to be on.

\* \* \*

[W]hen the case initially comes in, the police officer has prepared reports. Follow-up investigation is absolutely necessary if the case is going to be handled—handled correctly; that is, we assure ourselves—the deputy is going to assure himself or herself that we have the right person, that we have the right

charges, that there aren't other suspects out there, that there aren't other people who were responsible. So right from the beginning the deputy district attorney gives direction to the officer as to what kind of follow-up to do, what other witnesses to interview, what other evidence to gather....

\* \* \*

If I—if I could just give a simple example, say a typical case, you have a group of young people who attend a party and during the party someone is stabbed. The officers have arrested one person and that person has been charged. Now, at the outset, only a fraction of what needs to be known is known at that point, only enough to charge the case.

What the deputy will find out from talking to civilian witnesses, by perhaps getting other reports, by getting any physical analysis of the evidence, is a lot more. We may find out this is not the person who did the stabbing at all. We may need to look at other suspects. We may find out information about this suspect or this defendant that requires investigation outside....

\* \* \*

[W]hen the deputy D.A. is in this fact-gathering—on this fact-gathering mission, it's not simply a way to tune-up a case to go to trial. That's not the point. The point is to find the truth and then to make some decisions. And the way that is done is then communicated back to the detectives in order to—in order for action to be taken.

Such general description reflects that investigative functions were part of the job description of prosecutors and investigators in the office where Longanbach and O'Brien worked.

5. Summary

■ A prosecuting attorney may perform many roles, or functions. *See Robi-*

*chaud,* 351 F.2d at 537 (citing Edward L. Barrett, Jr., *Police Practices and the Law–From Arrest to Charge,* 50 Cal. L.Rev. 11, 16–24 (1962)). Not all of these roles are protected by absolute immunity. *See Robichaud,* 351 F.2d at 537 ("The distinction between the roles may be significantly controlling."). We recognize that the two meetings with Flanders described here were to some degree related to trial preparation, even when viewed in the light most favorable to Genzler. The Supreme Court has cautioned, however, that "[a]lmost any action by a prosecutor, including his or her participation in purely investigative activity, could be said to be in some way related to the ultimate decision to prosecute, but we have never indicated that absolute immunity was that expansive." *Burns,* 500 U.S. at 495–96, 111 S.Ct. 1934. We therefore remain focused on the question whether the prosecutor's actions are *"intimately associated with the judicial phase of the criminal process." Id.* at 487, 111 S.Ct. 1934 (emphasis added) (quoting *Imbler,* 424 U.S. at 430, 96 S.Ct. 984). We do not read the record here, resolving all ambiguity in favor of Genzler, to indicate such a close association between Longanbach and O'Brien's actions in their witness interviews with Flanders, on the one hand, and the judicial phase of Genzler's criminal trial, on the other, to entitle them to summary judgment that they are absolutely immune for those actions. We therefore affirm the district court's partial denial of summary judgment to Longanbach and O'Brien.

B. The Supervisory Defendants

The next issue is whether Pfingst, Thompson, and Pippen—the supervisory defendants—are entitled to absolute immunity. The district court understood the supervisory defendants to have moved for summary judgment on only three allegations in Genzler's complaint, specifically

paragraphs 74, 81, and 82.[3] The district court did not view the motion as including any other allegations against the supervisory defendants in Genzler's complaint, and its ruling did not extend to any such allegations. We construe the supervisory defendants' motion for summary judgment as did the district court.

We reverse the district court's denial of summary judgment with respect to the allegations contained in these three paragraphs. We apply the "function test" to determine whether the supervisory defendants are entitled to absolute immunity. *Roe v. City and County of San Francisco,* 109 F.3d 578, 584 (9th Cir.1997). To decide whether absolute immunity applies, we assume without deciding that Genzler has alleged a deprivation of a constitutional right under § 1983. *See Buckley,* 509 U.S. at 261, 113 S.Ct. 2606.

The relevant paragraphs state (1) that the supervisory defendants knew that Longanbach had granted Logel immunity in exchange for perjured testimony favorable to the prosecution; (2) that Longanbach had promised the supervisory defendants he would win Genzler's case; and (3) that the supervisory defendants were aware of and condoned a ploy to use Logel's perjured testimony to force the recusal of Genzler's counsel of choice. Each of these statements describes conduct closely related to prosecutorial decisions in the trial phase of Genzler's case. These actions all involve advocacy "intimately associated with the judicial phase of the criminal process," *Imbler,* 424 U.S. at 430, 96 S.Ct. 984, for which the supervisory defendants are entitled to absolute immunity. *See id.* at 431, 96 S.Ct. 984 (presenting perjured testimony protected by absolute immunity); *Mullinax v. McElhenney,* 817 F.2d 711 (11th Cir.1987) (offering a witness immunity in exchange for testimony protected by absolute immunity); *see also Rivera v.*

*Green,* 775 F.2d 1381, 1384 (9th Cir.1985) (holding that a prosecuting attorney and his supervisor had absolute immunity "for their actions in prosecuting a case against" a defendant).

## Conclusion

We affirm the district court's partial denial of summary judgment as to Longanbach and O'Brien. We reverse the district court's denial of summary judgment as to Pfingst, Thompson, and Pippen. We express no opinion about whether Genzler has stated a violation of a constitutional right that is actionable under 42 U.S.C. § 1983, or whether the defendants may be entitled to qualified immunity. We leave these determinations to the district court in the first instance.

AFFIRMED in part, REVERSED in part, and REMANDED.