# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

DAVID GENZLER,
                *Plaintiff-Appellee,*

        v.

PETER J. LONGANBACH,
                *Defendant-Appellant,*

        and

JEFFREY O'BRIEN; COUNTY OF SAN
DIEGO, a governmental entity; SAN
DIEGO COUNTY DISTRICT
ATTORNEY'S OFFICE; GREGORY
THOMPSON; JAMES PIPPEN; PAUL
PFINGST,
                *Defendants.*

No. 02-56572
D.C. No.
CV-01-01462-JNK

DAVID GENZLER,
                *Plaintiff-Appellee,*

        v.

PETER J. LONGANBACH; COUNTY OF
SAN DIEGO, a governmental entity;
SAN DIEGO COUNTY DISTRICT
ATTORNEY'S OFFICE,
                *Defendants,*

        and

JEFFREY O'BRIEN; GREGORY
THOMPSON; JAMES PIPPEN; PAUL
PFINGST,
                *Defendants-Appellants.*

No. 02-56573
D.C. No.
CV-01-01462-JNK
ORDER
WITHDRAWING
OPINION AND
DENYING
PETITION FOR
REHEARING AND
OPINION

6463

Appeal from the United States District Court
for the for the Southern District of California
Judith N. Keep, District Judge, Presiding

Argued and Submitted
December 2, 2003—Pasadena, California

Filed June 7, 2005

Before: Harry Pregerson, Robert E. Cowen,* and
William A. Fletcher, Circuit Judges.

Opinion by Judge W. Fletcher

_____

*The Honorable Robert E. Cowen, Senior United States Circuit Judge
for the Third Circuit, sitting by designation.

## COUNSEL

Robert L. Young, Edward Patrick Swan, Jr., Luce, Forward, Hamilton and Scripps, San Diego, California, Jeffrey G. Car-

ver, San Diego, California, Morris G. Hill, Office of the County Counsel, San Diego, California, for the appellants.

Patrick L. Hosey, Hosey & Bahrambeygui, San Diego, California, for the appellee.

---

## ORDER

The opinion filed on September 27, 2004, and published at *Genzler v. Longanbach*, 384 F.3d 1092 (9th Cir. Sep 27, 2004), is withdrawn and replaced by the attached opinion.

With the filing of this new opinion, the panel has voted unanimously to deny the petitions for rehearing. Judges Pregerson and Fletcher have voted to deny the petitions for rehearing en banc, and Judge Cowen so recommends.

The full court has been advised of the petitions for rehearing en banc and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petitions for rehearing and the petitions for rehearing en banc, filed by Appellants Longanbach and O'Brien, are **DENIED**.

---

## OPINION

W. FLETCHER, Circuit Judge:

Plaintiff David Genzler seeks damages under 42 U.S.C. § 1983 for violations of his constitutional rights during the investigation and prosecution of his state criminal homicide trial. Defendants San Diego County Deputy District Attorney Peter Longanbach and Investigator Jeffrey O'Brien appeal from the partial denial of their motions for summary judgment

based on absolute official immunity. Defendant supervisors in the San Diego County District Attorney's Office — District Attorney Paul Pfingst, Assistant District Attorney Gregory Thompson, and Deputy District Attorney James Pippen — appeal the district court's complete denial of their motion for summary judgment based on absolute and qualified immunity.

We affirm the district court's partial denial of Longanbach's and O'Brien's motions. Evaluating the timing and nature of their conduct, we conclude that there is a genuine issue of material fact about whether they were engaged in advocacy intimately associated with the judicial process when they interviewed a key witness, Sky Blue Flanders. However, we reverse the district court's denial of the supervisors' motion for summary judgment because we conclude that there is no genuine dispute that their involvement in prosecutorial decisions was advocacy intimately associated with the judicial process.

## I. Factual Background

The underlying homicide giving rise to this § 1983 suit occurred on April 18, 1996, when David Genzler stabbed Dustin Harless during a fight. On April 19, Genzler learned from a television news report that Harless had died from the stabbing. Genzler turned himself into the police and was arrested that day. After the arrest, Deputy District Attorney Longanbach and Investigator O'Brien were assigned to the case.

A criminal complaint was filed in Municipal Court on April 23, 1996, and Genzler's bail hearing was held on April 29. On May 23, a preliminary hearing was held in Municipal Court, and the judge found probable cause to bind the case over for trial. The criminal complaint was filed in Superior Court on May 24.

The prosecution filed a pre-trial motion to compel production of evidence from the defense. At the hearing on this

motion, Genzler's ex-girlfriend, Sherry Logel, testified under a grant of immunity that she had given a box of bloody clothing and a knife to Gerald Blank, Genzler's retained counsel. Blank said he had received the clothing and given it to the prosecution, but he denied receiving the knife. Longanbach then moved to recuse Blank as Genzler's counsel. At the hearing on this recusal motion, Logel testified that she had lied about delivering the knife to Blank. The trial judge granted the recusal motion after Longanbach said he planned to call both Logel and Blank as witnesses at Genzler's trial. In a letter she later wrote to Genzler, Logel claimed that Longanbach had pressured her to testify falsely about her communication with Blank.

After trial, a jury convicted Genzler of second degree murder of Harless. This conviction, however, was reversed by the California Court of Appeal on the ground that the trial judge had improperly recused Blank. The Court of Appeal also held that Genzler was entitled to a jury instruction on involuntary manslaughter because there was sufficient evidence to support a finding of imperfect self-defense. Genzler had also alleged prosecutorial misconduct in his first trial, but the Court of Appeal did not reach this issue. The San Diego District Attorney's office recused itself from Genzler's second trial, and Genzler was prosecuted by the State Attorney General's office. On retrial, a second jury found Genzler guilty of involuntary manslaughter.

Sky Blue Flanders, Harless's fiancée, was a key witness for the prosecution in both trials. On the day of the stabbing, Flanders had told the police that Genzler had approached her in his car while she was walking across the street and had asked her if she wanted a ride. According to Flanders, Harless was zipping up his jacket on the other side of the street when Genzler first spoke to her. She told police that Harless had then crossed the street and knocked on Genzler's window. As Flanders described the events to police that day, Genzler got out of the car, Harless and Genzler exchanged punches, Har-

less "flipp[ed]" Genzler to the ground, and Genzler stabbed Harless while Harless held Genzler on the ground. Flanders also told police that day that Harless was a skilled wrestler who had been involved in previous street fights. Police audio- and video-taped the interview with Flanders. Flanders testi- fied in a later hearing that she had repeated this version of events — in which Harless was on top of Genzler when Gen- zler stabbed him — to about 20 other people in the days fol- lowing Harless's death.

Sometime after Flanders spoke with police on the day of the homicide, she met with Deputy District Attorney Longan- bach and Investigator O'Brien. She met once separately with O'Brien sometime during the week before April 29, and once with Longanbach and O'Brien together on April 29. After these meetings, Flanders changed her story. She testified at the preliminary hearing on May 23 and at both trials that she remembered little of the actual fight because she was dis- tracted by the arrival of Scott Davis, the doorman at the bar Flanders and Harless had left just before the stabbing. Flan- ders further testified that she thought she remembered seeing Davis pulling Genzler off Harless after the stabbing.

In her testimony during Genzler's second trial, Flanders admitted that she had "answer[ed] evasively" in the first trial about whether Harless had ever been involved in past fights and explained that she had tried to answer questions to make it seem that she was only aware of Harless's participation in organized wrestling matches, not of his past history of street- fighting. She also testified in the second trial that she had felt pressure from Longanbach and O'Brien not to disclose Har- less's history of street-fighting.

Davis, the doorman, testified at the preliminary hearing and at both trials. In his interview with police the day after the homicide, Davis stated that he saw Genzler jump out of his car and chase Harless and Flanders as they walked away from him, hand-in-hand. This account was manifestly inconsistent

with the account Flanders had given police on the day of the homicide. Davis then met with O'Brien on April 25, and changed his story. In a report summarizing this April 25 meeting, O'Brien wrote that, "upon reflection," Davis considered that he had not seen the couple walking away from him hand-in-hand. At the May 23 preliminary hearing, Davis testified that Flanders and Harless were standing several feet apart when the fight began.

According to Genzler's version of events, the fight on April 18 began when Harless charged Genzler and punched him in the face. Genzler said that Harless had grabbed him, slammed his face to the ground and pinned his arm, and that Davis then began kicking him in the head. Genzler said that he stabbed Harless to defend himself from the attack.

After the second trial, Genzler was sentenced to six years for involuntary manslaughter. With credit for time already served, he was released on February 14, 2001.

## II.   The Present Action

After his release from prison, Genzler brought the present § 1983 action charging the defendants with prosecutorial misconduct both preceding and during his first trial.[1] The defendants moved unsuccessfully to dismiss Genzler's complaint under Federal Rule of Civil Procedure 12(b)(6). They then moved for summary judgment based on official immunity. The district court granted Longanbach and O'Brien's motions for summary judgment except for claims based on an allegation contained in paragraph 66 of Genzler's complaint. This paragraph alleges:

[Longanbach and O'Brien] suborned perjury. Specif-

---

[1]Because Genzler does not allege conduct that would necessarily imply the invalidity of his conviction after the second trial, this suit is not barred by *Heck v. Humphrey*, 512 U.S. 477 (1994).

ically, prior to the preliminary hearing and during the initial investigation of the incident, Longanbach and O'Brien met with Ms. Flanders and told her that in order to secure a conviction she needed to lie about what she saw on the night of the incident and about Mr. Harless' violent past.

The district court read paragraph 66 to state that Longanbach and O'Brien were engaged in an investigative activity when they convinced Flanders to change her version of the events she witnessed. Relying on our opinion in *Milstein v. Cooley*, 257 F.3d 1004 (9th Cir. 2001), the district court considered not only the nature of the defendants' acts but also their timing, and held that Genzler had produced sufficient evidence to create a genuine issue of material fact as to whether Longanbach and O'Brien had pressured Flanders to lie as part of their initial investigation. The district court accordingly denied this part of their motion.

The supervisory defendants also moved for summary judgment based on absolute and qualified immunity. The district court construed their motion to apply only to allegations contained in three paragraphs of the complaint: paragraphs 74, 81, and 82.[2] These paragraphs charged that Pfingst, Thomp-

---

[2]The specific allegations are:

74. LONGANBACH and O'BRIEN's misconduct did not stop there. On August 22, 1996, at an evidentiary hearing held before the Honorable Joan P. Weber, LONGANBACH granted prosecution witness, Sherry Logel, immunity in exchange for testimony favorable to the prosecution. This grant of immunity included immunity from perjury and *not just from past acts of perjury, but was intended to cover future acts of lying on the stand at the trial of plaintiff.* In essence, LONGANBACH gave Ms. Logel a "get out of jail free card" for lying on the stand. This was done with the knowledge of PFINGST, THOMPSON and PIPPEN.

81. Neither Mr. Blank nor Ms. Logel were called as trial witnesses by LONGANBACH. It [sic] The entire presentation of

son, and Pippen knew that Longanbach had granted Logel immunity in exchange for her perjured testimony, and that they had condoned Longanbach's tactics to force recusal of Genzler's counsel. The district court denied the supervisory defendants' motion in its entirety.

Longanbach, O'Brien, and the supervisory defendants timely appealed. Whether official immunity applies is a question of law we review de novo. *Milstein*, 257 F.3d at 1007. We have jurisdiction over interlocutory denials of motions for summary judgment based on official immunity "to the extent that [the district court's decision] turns on a question of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *see also Wilkins v. City of Oakland,* 350 F.3d 949, 951 (9th Cir. 2003) (quoting *Mitchell*). We construe all facts in the light most favorable to Genzler, the non-moving party, in deciding whether a dispute of fact is material and thereby precludes summary judgment. *See Butler v. San Diego County Dist. Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004).

## III.   Discussion

**[1]** A prosecutor is protected by absolute immunity from liability for damages under § 1983 "when performing the traditional functions of an advocate." *Kalina v. Fletcher*, 522 U.S. 118, 131 (1997). However, "the actions of a prosecutor are not absolutely immune merely because they are performed

---

false evidence and perjured testimony was nothing but an attempt to remove GENZLER's attorney from the case so as to improperly influence the outcome of the case which LONGANBACH had promised PFINGST, THOMPSON, and PIPPEN he would win.

82. LONGANBACH was excited by the recusal ploy he used. It became one of his favorite tactics. He tried the same tactic in other cases and on other attorneys. PFINGST, THOMPSON and PIPPEN were aware of what he was doing and how he was doing it, but continued to condone and ratify his conduct, because it worked.

by a prosecutor." *Buckley v. Fitzimmons*, 509 U.S. 259, 273 (1993). Prosecutorial immunity depends on "the nature of the function performed, not the identity of the actor who performed it." *Kalina*, 522 U.S. 118 at 127 (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)). Prosecutors are entitled to qualified immunity, rather than absolute immunity, when they perform administrative functions, or "investigative functions normally performed by a detective or police officer." *Id.* at 126. *See also Burns v. Reed*, 500 U.S. 478, 494-96 (1991). For convenience, we shall refer to the latter activities as "police type investigative work."

The Supreme Court has consistently "emphasized that the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Id.* at 486. Further, "the presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Id.* at 486-87. Finally we note that the Supreme Court has "been quite sparing in [its] recognition of absolute immunity, and ha[s] refused to extend it any further than its justification would warrant." *Id.* at 487 (citations and quotation marks omitted).

**[2]** To qualify as advocacy, an act must be "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976); *Kalina*, 522 U.S. at 125 (quoting *Imbler*); *Buckley,* 509 U.S. at 270 (same); *Burns*, 500 U.S. at 479 (same); *see also Milstein*, 257 F.3d at 1009 (prosecutorial immunity protects "the prosecutor's actions [that] are closely associated with the judicial process") (citing *Imbler*). Such activity is sometimes called "quasi-judicial" conduct. *E.g., Broam v. Bogan*, 320 F.3d 1023, 1029 (9th Cir. 2003) ("[I]n deciding whether to accord a prosecutor immunity from a civil suit for damages, a court must first determine whether a prosecutor has performed a quasi-judicial function. If the action was part of the judicial process, the prosecutor is entitled to the protection of absolute immunity whether or not he or she violated the civil plaintiff's

constitutional rights.") (citation and internal quotation marks omitted). In *Imbler*, the Court observed that absolute "immunity . . . leave[s] the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty." 424 U.S. at 432. However, the Court explained that absolute immunity for prosecutorial advocacy is justified because, "the alternative of qualifying a prosecutor's immunity would disserve the broader public interest" in protecting the prosecutor's abilities to exercise independent judgment and to advocate vigorously without the threat of retaliation. *Id.* at 429; *see also Milstein*, 257 F.3d at 1007-08. Thus, a prosecutor enjoys absolute immunity from a suit alleging that he maliciously initiated a prosecution, used perjured testimony at trial, or suppressed material evidence at trial. *Imbler*, 424 U.S. at 430. A prosecutor is also absolutely immune for direct participation in a probable cause hearing, *Burns*, 500 U.S. at 491, and for preparing and filing charging documents, *Kalina*, 522 U.S. at 130.

In *Buckley*, the Supreme Court explored the limits of prosecutorial absolute immunity. The Court denied absolute immunity to prosecutors who had fabricated evidence "during the early stage of the investigation" when "police officers and assistant prosecutors were performing essentially the same investigatory functions." 509 U.S. at 273. The *Buckley* Court also denied absolute immunity to prosecutors accused of holding a defamatory press conference — an activity which "had no functional tie to the judicial process." *Id.* at 277. In other cases, the Court has held that a prosecutor does not have absolute immunity for providing legal advice to police that probable cause exists to arrest a suspect, *Burns*, 500 U.S. at 491, or for personally attesting to the truth of evidence in support of charging documents, *Kalina*, 522 U.S. at 130.

The analysis of whether prosecutorial acts constitute advocacy or police-type investigative work is complicated by the fact that the Supreme Court has resisted any attempt to draw a bright-line between the two. In *Buchanan*, the court noted

that "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." 509 U.S. at 274. This might suggest that once probable cause is present, or once an arrest has been made, a prosecutor assumes an advocacy-related role and enjoys absolute immunity. However, in a note appended to the quoted passage, the Court rejected this approach, explaining that "a determination of probable cause does not guarantee a prosecutor absolute immunity for liability for all actions taken afterwards. Even after that determination . . . a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." *Id.* at 274 n.5.

**[3]** The Court has also rejected the idea that prosecutors are only entitled to qualified immunity when they are engaged in investigation. In *Buchanan*, the Court said that "evaluating evidence and interviewing witnesses" in preparation for trial is advocacy. *Id.* at 273. This is true, notwithstanding the fact that some of the activities a prosecutor takes in preparation for trial, like the interview of witnesses, may be investigatory in nature. The question is whether a prosecutor's investigation is of the type normally done by police, in which case prosecutors enjoy only qualified immunity, or whether an investigation is bound up with the judicial process, thus affording prosecutors the heightened protection of absolute immunity. With this framework in mind, we consider the specific allegations against the defendants.

## A.   Longanbach and O'Brien

### 1.   Witness Interviews: The Functional Analysis

The claim against Longanbach and O'Brien that survived summary judgment is that "prior to the preliminary hearing and during the initial investigation of the incident . . . [they] met with Ms. Flanders and told her that in order to secure a conviction she needed to lie about what she saw on the night of the incident and about Mr. Harless' violent past." Like the

district court, we understand this claim to state that as part of the initial investigation Longanbach and O'Brien coerced or encouraged Flanders to lie.

[4] Witness interviews may serve either an investigative or an advocacy-related function, as may other methods of gathering or manufacturing evidence prior to trial. *See KRL v. Moore*, 384 F.3d 1105, 1110-16 (9th Cir. 2004) (holding that pre-trial evidence gathering intimately associated with the judicial process was protected by absolute immunity, while evidence gathering for a collateral investigation was not). Viewing the evidence in the light most favorable to Genzler, we must decide whether Longanbach and O'Brien were engaged in an advocacy-related function "intimately associated with the judicial phase of the criminal process" when they met with Flanders, or whether they were engaged in police-type investigative work. *Imbler*, 424 U.S. at 430; *see also Milstein*, 257 F.3d at 1009; *Broam*, 320 F.3d at 1029. If the former, they are absolutely immune. If the latter, they are entitled only to qualified immunity.

[5] If not done in a quasi-judicial capacity, the acquisition or manufacturing of evidence is not protected by absolute immunity. *Milstein*, 257 F.3d at 1011 ("acquiring known false statements from a witness for use in a prosecution is . . . fabricating evidence that is unprotected by absolute immunity"). In *Moore v. Valder*, 65 F.3d 189, 194-95 (D.C. Cir. 1995), the D.C. Circuit held that a prosecutor had not met his burden to show that he was entitled to absolute immunity for acts of intimidating and coercing witnesses into changing their testimony before a grand jury. The court held that such activity constitutes

a misuse of investigative techniques legitimately directed at exploring whether witness testimony is truthful and complete and whether the government has acquired all incriminating evidence. It therefore

relates to a typical police function, the collection of information to be used in a prosecution.

*Id.* at 194 (citing *Barbera v. Smith*, 836 F.2d 96, 100 (2d Cir. 1987)).

**[6]** Prosecutors are, however, absolutely immune "for gathering additional evidence after probable cause is established or criminal proceedings have begun *when they are performing a quasi-judicial function*." *Broam*, 320 F.3d at 1030 (emphasis added). As the Court in *Buckley* explained,

[t]here is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a police officer, it is neither appropriate nor justifiable that, for the same act, [absolute] immunity should protect the one and not the other.

509 U.S. at 273. A prosecutor gathering evidence is more likely to be performing a quasi-judicial advocacy function when the prosecutor is "organiz[ing], evaluati[ng], and marshaling [that] evidence" in preparation for a pending trial, in contrast to the police-like activity of "*acquiring* evidence which might be used in a prosecution." *Barbera*, 836 F.2d at 100.

**[7]** The timing of evidence gathering is a relevant fact in determining how closely connected that conduct is to the official's core advocacy function in the judicial process, and thus informs the inquiry into whether the official's conduct is protected by absolute immunity. The Supreme Court has held that when a witness is being coached at or during a break in

trial, the prosecutor is protected by absolute immunity even if he or she is instructing the witness to lie. *Imbler*, 424 U.S. at 430, 431 n.33; *cf. Herb Hallman Chevrolet, Inc. v. Nash Holmes*, 169 F.3d 636, 643 (9th Cir. 1999) (holding that prosecutors were absolutely immune for interviewing new witnesses during investigative grand jury proceedings, when the majority of other witnesses had been interviewed prior to the initiation of proceedings).

Longanbach and O'Brien rely on the timing of their meetings with Flanders to argue that they are entitled to absolute immunity. They point out that their meetings with Flanders occurred after Genzler's April 19 arrest, which Genzler concedes was based on probable cause. However, as we noted above, in *Buckley*, the Court was careful to state that "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination . . . a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." *Id.* at 274 n.5. While interviews conducted before probable cause to arrest has been established are not protected by absolute immunity, the converse is not necessarily true. As the district court correctly observed, the courts have only "draw[n] the line in the reverse, stating that absolute immunity could not be invoked before probable cause was established." Indeed, in *Robichaud v. Ronan*, 351 F.2d 533, 535 (9th Cir. 1969), we held that prosecutors who, soon after the arrest of a suspect, directed police to coerce a confession from that suspect were not entitled to absolute immunity because their activity was more police-like than prosecutorial.

Timing is thus a relevant, but not necessarily determinative, factor. *See KRL*, 384 F.3d at 1111 (citing *Cousin v. Small*, 325 F.3d 627, 636 (5th Cir. 2003)); *see also Kulwicki v. Dawson*, 969 F.2d 1454, 1466 (3rd Cir. 1992). We also focus on whether the character of the meetings was more in the nature of quasi-judicial advocacy or police-type investigative work.

Because Deputy District Attorney Longanbach and Investigator O'Brien were engaged in slightly different functions, we analyze separately their entitlements to absolute immunity. As all parties acknowledge, it is appropriate to focus on the functions performed by Longanbach and O'Brien, not on their titles.

### 2. O'Brien's Meeting with Flanders Before April 29

[8] Viewing the facts in the light most favorable to Genzler, we conclude that O'Brien was engaged in police-type investigative work, not quasi-judicial advocacy, when he met with Flanders prior to Genzler's bail hearing on April 29, 1996. O'Brien's report indicates that he met with Flanders "several days prior" to April 29. In her testimony during the hearing on Genzler's 2000 motion to dismiss, Flanders estimated that this meeting took place about a week before the April 29 joint meeting with Longanbach and O'Brien. She remembered that she and O'Brien had talked for about an hour, "primarily . . . as to the identity of the person who stabbed [Harless]."

Police investigations were still ongoing. At this time, the preliminary hearing at which the judge would decide whether there was probable cause to hold Genzler for trial in superior court was still over a month away. Moreover, it is a supportable conclusion from the evidence that O'Brien's meeting with Flanders took place before the criminal complaint was filed in municipal court on April 23, 1996, and before police finished their investigation and written synthesis, which is dated April 24, 1996. *See Kulwicki*, 969 F.2d at 1465 (noting that filing of a criminal complaint is a relevant but not dispositive factor in determining whether an interview involves investigation or advocacy).

[9] The written police synthesis leaves out the initial statement by Flanders to police that Harless was on top of Genzler at one point during the fight. It emphasizes Davis's point of view, but it does not include Davis's story that Flanders and

Harless were walking hand-in-hand. If all factual inferences are resolved in favor of Genzler, one could conclude that O'Brien used this interview to change Flanders's story about what she remembered and to make her story more consistent with Davis's story.

Further, the record reflects that during this period, O'Brien was engaged in other work that can only be characterized as police-type investigation. For example, he and Longanbach interviewed Scott Davis on April 25, 1996. The notes from the conversation reflect only a narrative from Davis's point of view about the events of the stabbing. O'Brien joined police Detective Warrick in a meeting on June 3, 1996 with Sherry Logel, Genzler's ex-girlfriend, discussing her story about giving Genzler's knife to Blank, and Genzler's character in general. This conversation, too, was police-type investigative work, as indicated by the nature of the information obtained and by the presence of Detective Warrick. On June 5, 1996, O'Brien interviewed Paul Ernst, another witness to the homicide, about what he had seen. Similarly, on June 28, 1996, O'Brien met again with John Belsan, who came forward with evidence about a past fight with Genzler. Again, O'Brien's notes from this conversation reflect only Belsan's narrative about what happened in that confrontation. That O'Brien was engaged in police-type investigative work during the time he met with Flanders supports an inference that he was also engaged in such work when he met with her.

[10] We conclude from the foregoing that there is sufficient evidence in the record to support the conclusion that, during his first meeting with Flanders, O'Brien was, like the prosecutor in *Moore*, engaged in the process of acquiring or manufacturing evidence during performance of police-type investigative work, rather than engaged in quasi-judicial advocacy. At this stage of the proceedings, O'Brien is therefore unprotected by absolute immunity.

[11] Absolute immunity does not protect Longanbach if he was directing this police-type investigative activity by

O'Brien. *See Joseph v. Patterson*, 795 F.2d 549, 556 (6th Cir. 1986) ("a prosecutor who assists, directs, or otherwise participates . . . in obtaining evidence prior to an indictment undoubtedly is functioning more in his investigative capacity than in his quasi-judicial capacities of deciding which suits to bring and conducting them in court") (citation and internal quotation omitted); *Robichaud*, 351 F.2d at 537 (holding that prosecutors are not absolutely immune if they either "committed acts, or authoritatively directed the commission of acts, which ordinarily are related to police activity as opposed to judicial activity"); *cf. Burns*, 500 U.S. at 496 (prosecutor not entitled to absolute immunity for act of giving legal advice to police). Longanbach cannot, however, be liable for O'Brien's conduct on a theory of vicarious liability for any independent actions taken by O'Brien. *See Monell v. Dep't of Social Servs. of NY*, 436 U.S. 658, 691 (1978) (respondeat superior not available as theory of liability under § 1983).

**[12]** There is sufficient evidence in the record to support the conclusion that Longanbach was actively directing O'Brien throughout his work on the Genzler case, including O'Brien's first meeting with Flanders. For example, Flanders testified that Longanbach would give her instructions that O'Brien would then "reiterate." Genzler also introduced a declaration from another Deputy District Attorney stating that "Jeff O'Brien does whatever Mr. Longanbach told him to do." Because the evidence could support a conclusion that Longanbach was actively directing police-type investigative actions by O'Brien, Longanbach is also not entitled to summary judgment that he is absolutely immune for any action taken with respect to O'Brien's meeting with Flanders before April 29.

### 3.  Longanbach and O'Brien's April 29 Meeting with Flanders

The next question is whether Longanbach and O'Brien were engaged in police-type investigative work or quasi-

judicial advocacy in their joint April 29 meeting with Flanders.

We consider first the timing of the conversation. The criminal complaint had been filed by the time of Longanbach and O'Brien's April 29 meeting with Flanders. However, just as the existence of probable cause to arrest is not conclusive, we do not view the filing of the complaint as an event after which, by definition, all actions by the prosecutor and his staff are protected by absolute immunity. The timing of the April 29 meeting does not weigh as much in favor of absolute immunity as did the timing of the search carried out pursuant to a warrant in *KRL*, 384 F.3d at 1111-13. In *KRL*, we held that a prosecutor and his investigator were entitled to absolute immunity for seeking a search warrant and carrying out a search pursuant to that warrant more than three weeks after the grand jury returned an indictment indicating that it had found sufficient evidence for the defendant to stand trial. *Id.* When Longanbach and O'Brien met with Flanders, the preliminary hearing at which the court would determine whether there was probable cause for Genzler to stand trial was still more than three weeks away. On April 29, officials were continuing the process of investigation into the facts that would inform whether there was such probable cause, and the precise charges on which Genzler would stand trial had yet to be determined.

**[13]** We next consider the nature of the interview with Flanders. The Supreme Court has stated that

> acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the court of his [or her] role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include *the professional evaluation of evidence assembled by the police and appropriate preparation for its presenta-*

> *tion at trial* or before a grand jury after a decision to seek an indictment has been made.

*Buckley*, 509 U.S. at 273 (emphasis added); *see also Broam*, 320 F.3d at 1030. In *KRL*, we held that "to the extent that the second search warrant sought evidence to prosecute the crimes charged in the indictment," the prosecutors' authorization of that warrant and an investigator's subsequent search were protected by absolute immunity. 384 F.3d at 1112, 1118. We held that the prosecutors and the investigator were acting as advocates to the extent they were reviewing, evaluating, and ensuring the admissibility of evidence in preparation for an already pending trial. *Id.*

**[14]** There is some evidence in the record that Longanbach and O'Brien were reviewing and evaluating evidence at the April 29 meeting in preparation for the preliminary hearing and trial testimony, including some testimony by Flanders describing the meeting at some of the later proceedings in Genzler's case. However, when we resolve all ambiguity in favor of Genzler and view the evidence in the context of other evidence about ongoing investigations, we conclude that evidence in the record supports the conclusion that Longanbach and O'Brien were engaged in police-type investigative work during the meeting.

The only notes in the record from the meeting were taken by O'Brien. They are captioned, "Witness Interview." These interview notes, like notes taken of other interviews by O'Brien, record only a narrative of what Flanders reportedly said at the meeting about the events of April 17 and April 18. The notes state that "FLANDERS had told me during a conversation that took place at her residence several days earlier that she had a clearer picture in her mind of the events surrounding HARLESS' death. She felt that she could relate them in a more organized fashion than she may have done earlier in the investigation." Specifically, the notes state that Flanders was "distracted" by the arrival of Scott Davis, which

is inconsistent with the initial statement Flanders made to police. The notes thus reflect that Longanbach and O'Brien were in the process of gathering information from Flanders during the meeting and possibly encouraged her to lie as part of their process.

The Fifth Circuit decision in *Cousin*, relied on heavily by Longanbach and O'Brien, is therefore inapposite. In *Cousin*, the Fifth Circuit held that a declaration by a witness who was allegedly coerced and intimidated into lying "eliminate[d]" any "ambiguity" about whether the prosecutor was engaged in an investigatory or quasi-judicial function when he interviewed that witness. 325 F.3d at 633. The declaration clearly showed that when the prosecutor met with the witness, "he did so to tell [the witness] how he should testify." *Id.* Here, by contrast, the interview notes show a process of police-type investigation — or, viewed in the light most favorable to Genzler, a process of manufacturing evidence while performing an police-type investigative work — not Longanbach or O'Brien acting as advocates by actively preparing Flanders for her testimony in court. *See Moore*, 65 F.3d at 194.

**[15]** We therefore agree with the district court that Longanbach and O'Brien are not entitled to summary judgment that they are absolutely immune for their actions during the April 29 meeting with Flanders.

### 4. Summary

**[16]** A prosecuting attorney may perform many roles, or functions. *See Robichaud*, 351 F.2d at 537 (citing Edward L. Barrett, Jr., *Police Practices and the Law—From Arrest to Charge*, 50 Cal. L. Rev. 11, 16-24 (1962)). Not all of these roles are protected by absolute immunity. *See Robichaud*, 351 F.2d at 537 ("The distinction between the roles may be significantly controlling."). We recognize that the two meetings with Flanders described here were to some degree related to trial preparation, even when viewed in the light most favor-

able to Genzler. The Supreme Court has cautioned, however, that "[a]lmost any action by a prosecutor, including his or her participation in purely investigative activity, could be said to be in some way related to the ultimate decision to prosecute, but we have never indicated that absolute immunity was that expansive." *Burns*, 500 U.S. at 495-96. We therefore remain focused on the question whether the prosecutor's actions are "*intimately associated with the judicial phase of the criminal process*." *Id.* at 487 (emphasis added) (quoting *Imbler*, 424 U.S. at 430) . We do not read the record here, resolving all ambiguity in favor of Genzler, to indicate such a close association between Longanbach and O'Brien's actions in their witness interviews with Flanders, on the one hand, and the judicial phase of Genzler's criminal trial, on the other, to entitle them to summary judgment that they are absolutely immune for those actions. We therefore affirm the district court's partial denial of summary judgment to Longanbach and O'Brien.

## B.   The Supervisory Defendants

The next issue is whether Pfingst, Thompson, and Pippen — the supervisory defendants — are entitled to absolute immunity. The district court understood the supervisory defendants to have moved for summary judgment on only three allegations in Genzler's complaint, specifically paragraphs 74, 81, and 82.[3] The district court did not view the motion as including any other allegations against the supervisory defendants in Genzler's complaint, and its ruling did not extend to any such allegations. We construe the supervisory defendants' motion for summary judgment as did the district court.

We reverse the district court's denial of summary judgment with respect to the allegations contained in these three paragraphs. We apply the "function test" to determine whether the

---

[3]*See supra* pages 6473-74, n.2.

supervisory defendants are entitled to absolute immunity. *Roe v. City and County of San Francisco*, 109 F.3d 578, 584 (9th Cir. 1997). To decide whether absolute immunity applies, we assume without deciding that Genzler has alleged a deprivation of a constitutional right under § 1983. *See Buckley*, 509 U.S. at 261.

**[17]** The relevant paragraphs state (1) that the supervisory defendants knew that Longanbach had granted Logel immunity in exchange for perjured testimony favorable to the prosecution; (2) that Longanbach had promised the supervisory defendants he would win Genzler's case; and (3) that the supervisory defendants were aware of and condoned a ploy to use Logel's perjured testimony to force the recusal of Genzler's counsel of choice. Each of these statements describes conduct closely related to prosecutorial decisions in the trial phase of Genzler's case. These actions all involve advocacy "intimately associated with the judicial phase of the criminal process," *Imbler*, 424 U.S. at 430, for which the supervisory defendants are entitled to absolute immunity. *See id.* at 431 (presenting perjured testimony protected by absolute immunity); *Mullinax v. McElhenney*, 817 F.2d 711 (11th Cir. 1987) (offering a witness immunity in exchange for testimony protected by absolute immunity); *see also Rivera v. Green*, 775 F.2d 1381, 1384 (9th Cir. 1985) (holding that a prosecuting attorney and his supervisor had absolute immunity "for their actions in prosecuting a case against" a defendant).

## Conclusion

**[18]** We affirm the district court's partial denial of summary judgment as to Longanbach and O'Brien. We reverse the district court's denial of summary judgment as to Pfingst, Thompson, and Pippen. We express no opinion about whether Genzler has stated a violation of a constitutional right that is actionable under 42 U.S.C. § 1983, or whether the defendants may be entitled to qualified immunity. We leave these determinations to the district court in the first instance.

AFFIRMED in part, REVERSED in part, and REMANDED.